(99 App. Div. 605)

MILLS et al. v. UNITED STATES PRINTING CO. OF OHIO et al.

KISSAM v. INTERNATIONAL STEREOTYPERS & ELECTROTYPERS UNION et al.

(Supreme Court, Appellate Division, Second Department. December 15, 1904.)

1. MASTER AND SERVANT—STRIKE—LEGALITY.

A mere concert of action on the part of labor unions and their members in the organization of a strike is not unlawful per se.

2. SAME—INJUNCTION—PICKETING.

An injunction against picketing, without qualification, is too broad, as "picketing" may mean simply the stationing of persons for observation, and in that sense is not unlawful per se.

3. SAME—BOYCOTTING.

An injunction against boycotting, without qualification, is too broad, as, in so far as boycotting is a mere abstention, it is not unlawful per se.

4. SAME—DISCHARGE OF SERVANT—INJUNCTION—JURISDICTION.

    An employé of a corporation, though a stockholder thereof, has no standing in court to enjoin his employer from discharging him because of his refusal to join a labor union, or from carrying out contracts made by the employer with labor unions involving an agreement to employ only union workmen.

    Appeal from Special Term, Kings County.

    Suits by William Kissam against the International Stereotypers & Electrotypers Union and other unions and the United States Printing Company of Ohio, and by William F. Mills and George H. Driscoll against the same defendants, for injunction. From an order continuing and making permanent a preliminary injunction against the labor unions and denying the injunction as to the printing company, the labor unions and the plaintiffs prosecute cross-appeals. Reversed on appeal of the labor unions, and affirmed on plaintiffs' appeal.

    Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, and HOOKER, JJ.

    Louis L. G. Benedict, for Electrotypers' Union of New York.

    Alfred Steckler (Levin L. Brown, on the brief), for International Stereotypers' & Electrotypers' Union and New York Stereotypers' Union No. 1 et al.

    George W. Wingate (T. Ellett Hodgskin, on the brief), for Kissam.

    J. E. Ludden, for United States Printing Company of Ohio.

    JENKS, J. The defendant printing company was ordered to show cause why an injunction should not issue, restraining it from discharging the plaintiff or any other of its workmen because of their failure to join the labor unions mentioned in the complaint, and from carrying out the provisions of two contracts made with two of the unions defendant. The other defendants were ordered to show cause why they should not be restrained and enjoined from in any way interfering with the plaintiff or any of his fellow nonunion workmen in their employment by the printing company, from organizing a strike against the said defendant printing company, from picketing, boycotting, or in any way interfering with its business management and affairs, or with any of its officers, agents, employés, or servants, and that they and each thereof be restrained from boycotting or in any way interfering with the sale of any goods manufactured by the defendant printing company. The order contained a preliminary injunction. Upon the hearing the Special Term continued the injunction pendente lite as to the defendants other than the printing company, but denied the injunction as against the printing company. These are cross-appeals from that order by the plaintiffs and by the defendants other than the printing company.

    It must be carefully noted that the defendants appellant are thus restrained from "organizing a strike against the defendant printing company," from "picketing," and from "boycotting." I think that the injunction against organizing a strike cannot stand, and that the injunction against picketing and boycotting runs in terms too broad, and that the learned Special Term rightly denied the injunction as against the printing company. The record contains many affidavits, full of

allegations, denials, counter allegations, and counter denials. This is natural to a hearing of such issues upon ex parte statements unsubjected to the tests of cross-examination, and unrestricted by rulings upon relevancy, materiality, or competency. It may be that the judgment upon trial will be far different from any preliminary relief which this record justifies. See Warsaw Waterworks Co. v. Warsaw, 4 App. Div. 509, 40 N. Y. Supp. 28; Meyers v. City of New York, 58 App. Div. 534, 69 N. Y. Supp. 529.

The defendants should not be restrained from "organizing a strike against the defendant printing company." An employé who has not bound himself to his master by contract cannot be bound to him by law. Therefore he may quit his work. If he may quit his work absolutely, he may quit it because the conditions thereof are not to his liking, and he is free to say that he will not take up that work until the conditions are to his liking. What one may lawfully do alone, he may do in concert, and hence a strike is not per se unlawful. The court in Nat. Protective Ass'n v. Cumming, 170 N. Y. 315, 321, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648, do not differ over the proposition that "a peaceable and orderly strike, not to harm others, but to improve their own condition, is not in violation of the law." See, too, Wunch v. Shankland, 59 App. Div. 482, 69 N. Y. Supp. 349.

"Picketing" may simply mean the stationing of men for observation. If, in the doing of this act solely for such purpose, there be no molestation or physical annoyance or let or hindrance of any person, then it cannot be said that such an act is per se unlawful. But "picketing" may also mean the stationing of a man or men to coerce or to threaten or to intimidate or to halt or to turn aside against their will those who would go to and from the picketed place to do business or to work or to seek work therein, or in some other way to hamper, hinder, or harass the free dispatch of business by the employer. In that case picketing may well be said to be unlawful. But the vice of the injunctive order lies in the fact that this word, unqualified, may signify a lawful act. See Krebs v. Rosenstein, 31 Misc. Rep. 661, 66 N. Y. Supp. 42, affirmed sub nom. Levy v. Rosenstein, 67 N. Y. Supp. 630, 56 App. Div. 618; Rogers v. Evarts (Sup.) 17 N. Y. Supp. 264; Cumberland Glass Mfg. Co. v. Glass Bottle Blowers' Ass'n, 59 N. J. Eq. 49, 46 Atl. 208; Rogers v. Evarts, supra, was affirmed sub nom. Reynolds v. Everett, 67 Hun, 294, 22 N. Y. Supp. 306, which was affirmed 144 N. Y. 189, 39 N. E. 72; Gray, J., saying: "There were absent the elements of intimidation, or, as the trial judge observed, of such circumstances surrounding the acts of persuasion and entreaty as would characterize them as intimidation." I may add that I am not prepared to say that all picketing which goes no further than "persuasion and entreaty" of those who are about to work or to seek work or to do business in the picketed place is absolutely lawful. A wayfarer upon the public street should be free for peaceful travel. No man against my will has the legal right to occupy the public street to arrest my course or to join me on my way, be he ever so polite or gentle in his insistence. There may be no intimidation, and yet an interruption of peaceful travel. There may be annoyance without danger.

The experience of Captain Boycott has added to our language a

substantive and a verb. There is little, if any, question as to the meaning of the substantive, but there is no commonly accepted definition of the verb. Some courts have defined it as necessarily implying violence or intimidation, or the threat thereof; others as but necessarily implying abstention. A. may refuse to trade with B. unless B. changes a certain policy, and A. may think that his attitude is necessary for his own welfare and protection. It cannot be contended that A. thereby offends the law. In Mogul Steamship Co. v. McGregor, L. T. Rep. lxvi, N. S. 1, Halsbury, L. C., says:

"Now, it is not denied, and cannot even be argued, that prima facie a trader in a free country, in all matters not contrary to law, may regulate his own mode of carrying it on according to his own discretion and choice."

Judge Cooley, in his work on Torts (2d Ed., p. 328), says:

"It is a part of every man's civil right that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice, or malice. With his reasons neither the public nor third persons have any concern."

If A. may take this step, it does not seem logical to hold that A. and C. together may not, and may not, by argument, persuasion, and entreaty, bring D. and E. to their side. If A., C., D. and E. cannot do what A. alone may lawfully do, the vice must be in the combination. But there is no dissent in our highest court over the proposition in Nat. Protective Ass'n v. Cumming, supra, that:

"Whatever one man may do alone, he may do in combination with others, provided they have no unlawful object in view. Mere numbers do not ordinarily affect the quality of an act."

Parker, C. J., and Vann, J., are in accord (pages 321, 338, 170 N. Y., pages 369, 376, 63 N. E., 58 L. R. A. 135, 88 Am. St. Rep. 648), and Gray, J. (the other judge who wrote in that case), has expressly affirmed this principle in his dissent in Straus v. American Publishers' Ass'n, 177 N. Y. 473, 491, 69 N. E. 1107, 64 L. R. A. 701. A.'s attitude may be trivial as to B., when that of the combination might enforce B.'s concessions, but this affords no legal reason against such combination. It is not in the breast of the court to stamp as illegal a combination for the betterment of the interests of the members thereof, or of some of them, and which, without incidental violence or intimidation, severs all business dealings with an outsider until it may secure it. If this be illegal, where can we draw the line so as to countenance association to insure united, and therefore effective, action to right what seems wrong, or to correct what seems an abuse, or to mark disapproval of some policy in the everyday affairs of our social life? The protest of one under threat of abstention may be unheeded, in view of the slightness of the penalty, when a like protest of many, with similar threat, is effective, and only because the penalty is too great to pay. Lawful and concerted protest can regulate many things within the law, without invoking paternal government.

It may be that the result of the boycott is a loss to him proscribed. Else the combination would fail of its purpose. But when the result sought by a boycott is to protect the members of the combination or to enhance their welfare, that loss is but the incident of the act—the

means whereby the ultimate end is gained. In Quinn v. Leathem, 1901 A. C. 495, Lord Shand marks the distinction between that case and the well-known case of Allen v. Flood, 1898 A. C. 1. He says:

"In Allen v. Flood the purpose of the defendant was, by the acts complained of, to promote his own trade interest, which it was held he was entitled to do, although injurious to his competitors, whereas in the present case, while it is clear there is combination, the purpose of the defendants was 'to injure the plaintiff in his trade, as distinguished from the intention of legitimately advancing their own interests.' * * * Lord Herschell, for example, said: 'The object which the defendant and those whom he represented had in view throughout was what they believed to be the interest of the class to which they belonged. The step taken was a means to that end.' * * * The case was one of competition in labor, which, in my opinion, is in all essentials analogous to competition in trade, and to which the same principles must apply."

I think that the statement of Bouvier is correct:

"A boycott is not unlawful unless attended with some act which in itself is illegal ([Bohn Mfg. Co. v. Hollis] 54 Minn. 223 [55 N. W. 1119, 21 L. R. A. 337, 40 Am. St. Rep. 319])."

I think that the verb "to boycott" does not necessarily signify that the doers employ violence, intimidation, or other unlawful coercive means, but that it may be correctly used in the sense of the act of a combination, in refusing to have business dealings with another until he removes or ameliorates conditions which are deemed inimical to the welfare of the members of the combination, or some of them, or grants concessions which are deemed to make for that purpose. And as such a combination may be formed and held together by argument, persuasion, entreaty, or by the "touch of nature," and may accomplish its purpose without violence or other unlawful means (i. e., simply by abstention), I think it cannot be said that "to boycott" is to offend the law. Bohn Manufacturing Co. v. Hollis, 54 Minn. 223, 55 N. W. 1119, 21 L. R. A. 337, 40 Am. St. Rep. 319; Sinsheimer v. United Garment Workers, 77 Hun, 215, 28 N. Y. Supp. 321; Cook on Trade & Labor Comb. § 9, p. 43; Tiedemann on State & Federal Control of Persons & Property, vol. 1, p. 440 et seq.; Bowen v. Matheson, 14 Allen, 499; Mogul Steamship Co. v. McGregor, L. R. 23 Q. B. 598, affirmed H. of L. L. T. Rep. lxvi, N. S. 1; Marx & H. J. Clothing Company v. Watson (Mo.) 67 S. W. 391, 56 L. R. A. 951, 90 Am. St. Rep. 440; Ulery v. Chicago Live Stock Exchange, 54 Ill. App. 233, 240; State v. Glidden, 55 Conn. 47, 8 Atl. 890, 3 Am. St. Rep. 23; Allen v. Flood, supra; Quinn v. Leathem, supra; Park & Sons Co. v. Nat. Druggists' Ass'n, 175 N. Y. 1, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578, per Haight and Cullen, JJ. In People v. Kostka, 4 N. Y. Cr. Rep. 429, so frequently cited, it is to be noted that Barrett, J., charged as follows:

"The mere fact that the defendants entered into an agreement to withhold their custom from Mrs. Landgraff, and to solicit others to withhold theirs, and that in the carrying out of that agreement they did not make use of illegal means or methods, they are not guilty of conspiracy, and should be acquitted. * * * Even though you find that the object of the agreement or confederation of the defendants was to adopt measures having a tendency to diminish the gains and profits of Mrs. Landgraff, that of itself is not unlawful, unless the means adopted to carry out the measure were unlawful."

The discharges in this case are the result of the agreement between the printing company and the union. It is clear enough that the com-

pany made this agreement in order to end the strike and the boycott. Thus the defendants secured the exclusive employment of their members, an adjustment of wages, and a determination of the working hours. If the defendants had the right to refuse to work for the printing company until their demands were met, I cannot see why they could not agree that they would work only under conditions which represented a concession of such demands. If the employer preferred to have these workmen work for him on the conditions that he should employ none but their fellows, increase their wages, and settle the hours of labor, than to have them strike and organize a boycott, I cannot see why, in the exercise of its right to regulate its own affairs, it could not follow this course and make the agreement.

There is a manifest discrimination, well recognized, between a combination of workmen to secure the exclusive employment of its members by a refusal to work with none other, and a combination whose primary object is to procure the discharge of an outsider and his deprivation of all employment. In the first case the action of the combination is primarily for the betterment of its fellow members. In the second case such action is primarily "to impoverish and to crush another" by making it impossible for him to work there, or, so far as may be possible, anywhere. The difference is between combination for welfare of self and that for the persecution of another. The primary purpose of one may necessarily but incidentally require a discharge of an outsider. The primary purpose of the other is such discharge, and, so far as possible, an exclusion from all labor in his calling. Self-protection may cause incidental injury to another. Self-protection does not aim at malevolent injury to another. The law views an injury arising from competition differently from an injury done in persecution. In Quinn v. Leathem, supra, Lord Shand, speaking of Allen v. Flood, supra, says:

"In that case I expressed my opinion that while combination of different persons in pursuit of a trade object was lawful, although resulting in such injury to others as may be caused by legitimate competition in labor, yet that combination for no such object, but in pursuit merely of a malicious purpose to injure another, would be clearly unlawful; and, having considered the arguments in this case, my opinion has only been confirmed."

That the aim of the union was not the discharge of the plaintiffs as individuals is clear from the clause in the agreement that they and all other present employés would be admitted to the union. Thus it was willing to avert in the only way possible the injury to the present employés which might arise from the agreement that henceforth only union men should be employed. It would seem that the purpose was not to drive out nonunion men that places might be made for union men, but to assure that there should be no employés in this branch who were not members of the union. It may well be that the union deemed it essential to the interests of its members who were employed that all the employés should be allied, so as to act henceforth in concert on questions of wages, work hours, privileges, or of the employment of only those to work with them who were approved by them as skillful and competent. This is a fair inference, because the union did not need to afford this privilege of admission. If it be said that the employer insisted on this provision, nevertheless it appears that the union

was willing to insert it. Presumably it would not have done so if the object of the strike was to cause the discharge of the plaintiffs and their fellows, unless, of course, the strike had failed in such respect. What is the scope and effect of the agreement but to secure the employment of workmen under the conditions imposed by them? The printing company agrees to take their labor under these conditions, and the workmen agree to give it under these conditions. Is either party to the contract seeking to avoid it? If the employer has the right to employ whom it chooses, and the employés have the right to work for whom· they choose, and under such conditions as they may impose, is an outsider to be heard that the agreement between employer and employé must not be performed because perforce thereof the employer can no longer keep him in service? How can he be heard unless he has some vested right of retention by the employer? In Nat. Protective Ass'n v. Cumming, supra, Gray, J., in his concurring memorandum, pertinently says:

"They infringed upon no law in declaring to the employers of members of the appellant organization that they refused to work with them, or that they would abandon their work unless others were discharged, or in preventing the members of the appellant association from being employed as steamfitters. The case is not within the principle of Curran v. Galen, 152 N. Y. 33, 46 N. E. 297. Upon the facts of that case, as they were admitted by the demurrer to the complaint, the plaintiff was threatened, if he did not join a certain labor organization, and so long as he refused to do so, with such action as would result in his discharge from employment, and in an impossibility for him to obtain other employment anywhere; and, in consequence of continuing his refusal to join the organization, his discharge was procured through false and malicious reports, affecting his reputation with members of his trade and with employers."

See, too, the discrimination made by McLaughlin, J., in the judgment of the Appellate Division (53 App. Div. 227, 235, 65 N. Y. Supp. 946).

It may be queried whether the plaintiff has any status to attack this agreement. In the judgment in Mogul Steamship Company v. McGregor, in the House of Lords, supra, a great judge (Lord Watson), speaking of the decision in Hilton v. Eckersley, 6 E. & B. 47, that an agreement of certain traders could not be enforced, says:

"In my opinion, it is not an authority for the proposition that an outsider can plead the illegality of such a contract, whilst the parties are willing to act and continue to act upon the ground that they had agreed to act for a specific period."

In Mayer v. Journeymen Stonecutters' Association, 47 N. J. Eq. 519, 20 Atl. 492, the jurisdiction of the court was invoked on the ground, inter alia, that the right of the plaintiff to work was property, and the right of the other complainants to employ them was property, also, and that the anticipated acts of the defendants, which included a refusal to work, save with their own members, warranted injunctive relief. This was refused; Vice Chancellor Green saying, after a long discussion:

"They have agreed not to work with any but members of their own association, and not to work for any employer who insists on their doing so, by withdrawing from his employment. So long as they confine themselves to peaceable means to effect these ends, they are within the letter and spirit of the law, and not subject to the interference of the courts."

Assume that the agreement is performed; what results to the plaintiffs who refuse to join the union? Their discharge from this employment. But is not the employer free to discharge them, even without reason, or for any reasons which seem to him sufficient, no matter how shortsighted, quixotic, unjust, or arbitrary? Independent of the obligation of contract, the workman may quit employment, and the master may discharge the workman, beyond the interference of the courts. If the employer can compel the employé to work against the latter's will, this is servitude. If the employé can compel the employer to give him work against the employer's will, this is oppression. · If the courts sit to prevent discharges of workmen, or to require the workmen to remain at service, they exercise a paternal and visitatorial function beyond my ideas of their province. It would be a step far in advance, were the courts to sit in scrutiny of the reasons for the acts of either employé or employer. It would be intolerable if every discharge or every quittance of work must receive the visé of a court only when the respective grounds thereof appealed to its judgment. The court is neither employer nor employé, and cannot stand in the shoes of either one.

I will assume that, but for the agreement with the union, the printing company would not discharge the plaintiffs. Can the printing company come to the court and say: "I have made an agreement which I do not seek to avoid. Perforce of it I intend to discharge the plaintiffs if they remain nonunion men, but, were it not for the agreement, I would have no reason to discharge them. Therefore halt me in the doing of this thing?" If the court intervenes, does it not do so because it can determine the right of the master to discharge by weighing his reasons for it? The employer is not the ward of the court. The court puts the responsibility upon him. It assumes that he is free to choose, but at the same time it assures the employé of the right to choose; and, when the employer has chosen, it does not stay his election upon any scrutiny of his reasons. It will not halt him when he proposes to go on. And the employé cannot be heard upon the reasons which move the employer to discharge him. Unless, then, the plaintiffs have a right to retention, what interest have they that warrants the court to hear their plea that the employer must not perform this agreement because it involves their discharge? See Reid v. Vanderheyden, 5 Cow. 728, 733; Grant v. Duane, 9 Johns. 591, 612; Baxter v. Baxter, 43 N. J. Eq. 82, 86, 10 Atl. 814, affirmed on opinion below 44 N. J. Eq. 298, 18 Atl. 80. What special or peculiar damage can the plaintiffs show to warrant private·suit? See Cranford v. Tyrrell, 128 N. Y. 341, 28 N. E. 514.

The plaintiff Kissam, who is not only an employé of the printing company, but also a holder of 25 shares of its stock, complains as such stockholder. It appears that the agreement was made on behalf of the printing company by all of the members of the executive committee appointed by the board of directors to manage its business in the boroughs of Brooklyn and Manhattan. Of that committee, one is the first vice president and general Eastern manager. Presumably the board of directors in the first instance would control such a matter of corporate administration or policy as the engagement, discharge, or

selection of employés.   If so, this committee seems to have full authority in the premises.   Hoyt v. Thompson's Executor, 19 N. Y. 207. See, too, Beveridge v. N. Y. E. R. Co., 112 N. Y. 1, 23, 19 N. E. 489, 2 L. R. A. 648.   For aught that appears in the record, the general rule stated in Gamble v. Queens County Water Co., 123 N. Y. 91, 98, 99, 25 N. E. 201, 9 L. R. A. 527, and in Flynn v. Brooklyn City R. Co., 158 N. Y. 493, 507, 53 N. E. 520, must obtain.

I said at the outset that the judgment on trial may be far different from the determination upon the papers now before us.   The evidence may put the combination within the prohibition of the principle of Curran v. Galen, supra; may justify an injunction against the picketing in the manner of its doing, against the boycotting in the methods of its practice, and more.   But as I think that the printing company is free to discharge the plaintiffs and their other workmen, and that the other defendants have the right to organize a strike, and to picket and boycott, within the limitations which I have sought to state in this opinion, and that the record does not justify a retention of the injunction against picketing and boycotting, with specifications and limitations, the order must be modified in accord with these views, and, as modified, must be affirmed, without costs.   All concur; HIRSCHBERG, P. J., and BARTLETT, J., in result.