JULIUS KAYSER, Plaintiff, *v.* JAMES FITZGERALD, Individually and as President, etc., Defendants.

(Supreme Court, Otsego Special Term, October, 1919.)

Contempt — criminal — unlawful acts of strikers and punishment therefor — rights of employer and employees — injunctions — labor unions.

> While workmen have an absolute right to organize and to strike, other men who are willing to work have an equal right to pursue their labors unmolested.
>
> The right of an employer to hire whomsoever it pleases provided it can induce men to enter such employment, cannot be interfered with by threats, intimidation or coercion on the part of its employees who are out on strike whether they act singly or as a result of an organization or conspiracy.
>
> Where it clearly appears that the purpose of certain of the striking employees of plaintiff was not by peaceful persuasion to endeavor to prevent men from entering the employment of plaintiff but by threats and intimidation of those seeking such employment and of those actually employed to compel plaintiff to accede to the demands of the strikers or else destroy plaintiff's business, they exceed their lawful right.
>
> Where upon an application to punish said certain striking employees as for a criminal contempt they, making no denial of knowledge of the provisions of both preliminary and permanent injunction orders which had been published and served upon each of them, confined their defense solely to a denial of the acts charged or that there was any intention to violate the

injunction, an order may be granted adjudging them and each of them in contempt with direction as to the punishment in each instance.

APPLICATION to punish for contempt.

Hardy, Stancliffe & Whitaker (Owen C. Becker and H. C. Stratton, of counsel), for plaintiff.

O'Connor & O'Connor, for defendants.

KELLOGG, A. L., J. This is an application to punish Robert F. Stump, Otto Boelke, Harry T. Wilpers and Hannah Chrisman for disobedience of an injunction order herein, made June 23, 1919, modified June 25, 1919, and made permanent during the pendency of the action July 24, 1919.

On July twenty-ninth last, a show cause order was duly granted herein directing said persons to show cause at a Special Term of this court to be held on August fifth, at Binghamton, and after hearing the attorneys for the respective parties, an order was made appointing Hon. William H. Johnson, a lawyer of profound learning and ability, as referee to hear and take the evidence of the parties to these procedings, and such witnesses as they desired to produce, and to make his report to this court.

Upon the argument of this motion the counsel for the defendants stated that he desired to file opposing affidavits, and in the order of reference the defendants were granted the privilege of serving such opposing affidavits on Owen C. Becker, one of the attorneys for the plaintiff, on or before August fifteenth. No opposing affidavits were served, and in the opening of this hearing the defendants' attorneys announced that they did not propose to file any affidavits, but would rely entirely upon the oral testimony.

The hearing before the referee was commenced on the eighteenth day of August, and, after successive adjournments, was completed on the eighth day of September.

The referee made his report on the first day of October, and the court thereupon gave notice that it would hear arguments as to whether or not the report should be confirmed on October fourth, at Supreme Court Chambers in Oneonta.

It is said by counsel for the defendants that the report is not sustained by the evidence. After a most careful perusal of the same I am not able to so find. The referee was selected with care, and is as able, impartial and fearless as could be named. He not only heard the evidence, but he saw the witnesses on the stand and could judge of their appearance, and this is precisely one of those cases where that help is most needed to reach the truth.

The findings of the referee also show care and thought. Were the evidence slighter than it is, I should still hesitate to set aside his conclusions.

The plaintiff is a manufacturing corporation, and one of its factories is located at Sidney. During the month of May, last, a large percentage of the operatives of its factory at that place went out on a strike.

There are three unions at Sidney — the Dyers and Finishers, the Warpers and Warp Hands, and the Glove-makers. At all times since the beginning of the strike, the defendants Wilpers and Chrisman have been the presidents of the Warpers and Glove-makers unions respectively. The defendant Stump has been, during the same period, president of the Warpers and Warp Hands Federated Union of America. The defendant Otto Boelke is a resident of Amsterdam, and an employee of plaintiff's factory at that place, and is a member of one of the local trade unions of

that city composed of plaintiff's employees. The unions of Amsterdam, of which Boelke is a member, went out on strike at about the same time as the Sidney employees of the plaintiff.

The preliminary and permanent injunction orders were published in the Sidney *Record,* and copies of the order making the injunction permanent were mailed to the defendants, and to each of the strikers, on July twenty-sixth. Each of the defendants had actual notice of the original injunction order, this order as modified, and the order making the preliminary injunction permanent. They do not deny knowledge of the provisions of these orders, but confine their defense solely to a denial of the acts charged, or that in any event they had no intent to violate the same.

Wilpers was personally served with the original order, and requested the defendants' attorney to explain its provisions at a mass meeting of July first, and thereafter both the defendants Wilpers and Stump explained its provisions at subsequent union meetings.

Stump was the leader and superior officer of the striking unions. They looked to him for guidance and direction. He was well acquainted with every move made in this strike. He does not deny this, and the testimony all clearly indicates this fact. On the motion of July first he made one of the answering affidavits. At the mass meeting on the same day, when the modified injunction order was explained by his counsel, he was present, and was one of the speakers. At a subsequent meeting he explained the injunction provisions to the strikers.

Boelke was present at the meeting of July first, and at subsequent meetings when the injunction order was explained. He had read the injunction tacked upon plaintiff's factory, and a copy was nailed up in union headquarters.

Hannah Chrisman testifies that she first learned about the injunction order along in June, about a week after it was served; knew about the motion of July first, and who was attorney for the unions. She attended meetings of the unions at which instructions were given. All four defendants admit knowledge from the first. Not one of them attempts to deny it. The reason the provisions of the injunction order were violated and disobeyed was not because any of the four defendants were without notice, but because they believed as Stump said to Julius Hall, when he attempted to read its provisions to him, "It don't amount to anything."

This attitude of Stump, their superior officer and leader, was accepted by other leaders, and by all the strikers. Stump's disregard of this injunction order was further evidenced by his statements when the show cause order in these proceedings was served upon him, that "They did not amount to anything; that he would frame this one and put it upon the wall." He also said to a large crowd when served with said order, that "The injunction order did not amount to much of anything; that it was a matter for the lawyers to see to, and that it did not concern the strikers." The reason the injunction provisions were disregarded was the indifference and contempt for it on the part of the leaders, these defendants.

The provisions of the preliminary injunction order, and as modified, and the injunction order as made permanent, were substantially the same. The notice of the provisions of any one was notice of the provisions of the other.

Shortly after the strike was instituted, a paid picket numbering about thirty-five members, was organized at Sidney. Thereafter, on each working day, when plaintiff's employees were going to and from their

work, strikers numbering from thirty to one hundred and twenty-five marched up and down Clark street, the street leading to plaintiff's factory, and called plaintiff's employees " yellow," "scab," " pimp," "yellow dog," " yellow rat " and other annoying names, thereby inciting and encouraging such conduct on the part of the strikers. None of the defendants have exercised proper restraint over or direction of said strikers in accordance with the duty incumbent upon them.

*Robert F. Stump.* On or about the thirteenth day of July, Stump said to the strikers: " There they go, the yellows, get out and get after them," after which the strikers followed up plaintiff's employees and called them " yellow," " yellow dog " and " rats " as they were leaving the mill.

Between the sixteenth and twenty-ninth days of July he told the strikers to " get on their job." Thereafter the strikers went to plaintiff's factory and followed up its employees and called them " yellow," " yellow dog " and " pimp."

July seventeenth he directed three or four strikers to " go after Earl Fleming," one of plaintiff's employees, after which the defendant followed Fleming and called him names.

On July twenty-first, when the president of the village of Sidney offered to read the injunction order to the strikers and to him, Stump said: " It don't amount to anything," and on the same occasion Richard Dunn, one of the strike leaders, said to the strikers, in his presence: " Pay no attention to it, do just the same as you have been doing." Stump did not remonstrate but encouraged this attitude by his conduct and remarks.

*Otto Boelke.* During the week of July fourteenth, Boelke met King, plaintiff's superintendent, at its fac-

tory and said to him: " Stick out your tongue, show your tongue," and on other occasions, on the streets, repeatedly said to King: " Stick out your tongue, I want to see if it is yellow," and at various other times, between the tenth and twenty-ninth days of July, marched with the strikers and called plaintiff's employees " yellow," " yellow rats," " yellow dogs," " yellow skunks " and other names.

On July fifteenth, in the presence of Stump, he followed Paul Winkler, an employee of plaintiff, and assaulted Winkler by forcibly grabbing him by the arm and coat as he was going to work, and on this occasion called him a " God damn son-of-a-bitch," and said: " He might as well be knocked in the head as go down there." On this occasion Stump directed Boelke to knock a cigar out of the mouth of one Pendlebury, an employee of the plaintiff.

On July sixteenth, when Winkler was going to work, he said: " There goes that God damn Dutch bastard. There goes that God damn Hun." About a week later Boelke said to Winkler: " If you go to Amsterdam something will happen to you."

On July twentieth, or about, Boelke and three companions followed plaintiff's superintendent about the streets for upwards of half an hour for the purpose of annoyance.

*Harry T. Wilpers.* On June thirtieth he said to Kenneth Dibble and Howard Goodenough, employees of plaintiff, when they were on their way to the factory that " If they went back to work " he would " kick " one part of their person (using a foul word).

That all four of the defendants, almost daily during the period from the first to twenty-ninth day of July, marched up and down Clark street in Sidney, and, as plaintiff's employees went to and from their work,

joined with the strikers in following said employees, both those walking and those riding in automobiles, and shouting after them, and calling " yellow " and other annoying names; that all of the matters pertaining to the strike and its policies were discussed by the strikers in their tri-weekly meetings; and such conduct was apparently part of a scheme, and as a matter of .fact constituted an organized and combined effort . on their part not only to prevent plaintiff's employees from working, but to prevent plaintiff from carrying on its business and to hinder and hamper the same.

It is true, of course, that men have a right to strike, and that they have a right to cooperate together, and the organization and co-operation which men form is not against public policy, but is to be commended when their purposes are legitimate and lawful; but while they have that absolute right, other men who are willing to work have an equal right to pursue their labors unmolested, and the plaintiff has just that same right to employ whomsoever it pleases, provided it can get men to enter such employment, and this right cannot be interfered with by threats, intimidation or coercion by the defendants, whether they act singly or as a result of an organization or conspiracy.

In this case the evidence points unmistakably to the fact that the purpose of the defendants was not by peaceful persuasion to endeavor to prevent men from entering the employment of the plaintiff and working, but on the other hand it seems as though the defendants took the course they did, and by the means complained of, to compel the plaintiff to accede to their demands, or else destroy its business, and in doing that they exceeded their rights, under the decisions of this state.

In order to constitute intimidation, it is not necessary that there should be any direct threat, still less

any actual act of violence. It is enough if the mere attitude assumed by the defendants is intimidating, and this may be shown by all of the circumstances of the case, by the methods of the defendants, and numbers, their devices. *New York Central Iron Works Co.* v. *Brennan,* 105 N. Y. Supp. 869; *Foster* v. *Retail Clerks International Protective Assn.,* 39 Misc. Rep. 48; *People* v. *Wilzig,* 4 N. Y. Crim. 403; *People* v. *Kostka,* Id. 429.

In *Mills* v. *United States Printing Co.,* 99 App. Div. 605, Jenks, J., said: " ' Picketing ' may simply mean the stationing of men for observation. If in the doing of this act, solely for such purpose, there be no molestation or physical annoyance, or let or hindrance of any person, then it cannot be said that such an act is *per se* unlawful. But ' picketing ' may also mean the stationing of a man or men to coerce or to threaten, or to intimidate or to halt, or to turn aside against their will those who would go to and from the picketed place to do business, or to work, or to seek work therein, or in some other way to hamper, hinder or harass the free dispatch of business by the employer. In that case picketing may well be said to be unlawful. * * * I may add that I am not prepared to say that all picketing which goes no further than ' persuasion and entreaty' of those who are about to work or to seek work or to do business in the picketed place is absolutely lawful. A wayfarer upon the public street should be free for peaceful travel. No man against my will has the legal right to occupy the public street to arrest my course, or to join me on my way, be he ever so polite or gentle in his insistence. There may be no intimidation, and yet an interruption of peaceful travel. There may be annoyance without danger.''

What constitutes peaceful picketing may be answered

Supreme Court, October, 1919. [Vol. 109.

by any fair-minded man if this question is asked: "Would this be lawful if no strike existed?"

Would it be lawful for one or more men to use offensive, abusive, insulting or threatening language to another or others; for one to call another a " rat," a " scab," a " yellow dog," a " yellow rat " or a " Hun," or, by any other name commonly accepted as offensive or degrading, or calculated to provoke the other to break the peace in resentment, or to so intimidate them that he or she would refuse to work?

Because such occurrences are liable to be the result of passions inflamed by such controversies, there is an insistent and undeniable demand that all persons having part in a strike who are trying to exercise their rights under the law to maintain the strike should be persistent in their efforts to keep the controversies within lawful bounds, and to guard that these inexcusable results do not follow. Otherwise, in the estimate of the public generally, they will be held to some considerable measure of responsibility.

It was not given anyone the privilege to enforce his views upon others; to compel others to listen. The right of others to listen or decline to listen is as sacred as that of free speech. It is clear that if one does not desire speech of another, he may as surely have his privacy therefrom as the privacy of his home. It is undeniable that the so-called right of peaceful persuasion may be exercised only upon those who are willing to listen to the persuasive arguments.

It is a safe and proper generalization that any action having in it the element of intimidation, coercion or abuse, physical or verbal, or of invasion of rights of privacy, when not performed under sanctions of law by those lawfully empowered to enforce the law, is unlawful. Every act, of speech, of gesture, or of conduct, which any fair-minded man may reasonably

judge to be intended to favor insult, threat or annoyance to another, or to work assault or abuse on him, is unlawful.

Government fails in its duty and liberty ceases to exist when it lies within the power of one man or group of men to deny to any man or group of men the right to seek and accept such employment as they desire.

These propositions are so elemental that but for the confusion which exists in many minds that a labor controversy affects the commonest rules of life, it would seem a waste of time to state them. The existence of a strike does not make that lawful which would otherwise be unlawful. These personal rights to which we have alluded are, in each instance, precisely those which the striker himself would insist upon were conditions reversed. They are also so plain, and the answers to the questions involving them so certain, that one called upon to enforce the law, if he has but ordinary intelligence, will plainly fail to do his duty when in his presence a fellow citizen suffers an invasion of his rights of this character. *Stephens* v. *Ohio Tel. Co.*, 240 Fed. Repr. 759; *St. Germain* v. *Bakery & Confectionery Workers' Union*, 166 Pac. Repr. 665.

I find, therefore, that the three men and women named deliberately disobeyed the order of the court. This makes it a case of criminal contempt. The only question left is as to the proper punishment to be inflicted upon them for what they have done. The facts being as they are in this case, every consideration of law and order requires such a sentence as will prevent these acts in the future.

An injunction is not sacred as coming from any man, but to disobey it is a serious thing, because it is disobeying the law, which, in this country, workmen themselves helped to make and should help to uphold.

An order may therefore be made:

(1) Directing that Robert F. Stump be imprisoned for the period of thirty days, and that he be fined the sum of $250.

(2) That Otto Boelke be imprisoned for the period of thirty days, and that he be fined the sum of $250.

(3) That Harry T. Wilpers be imprisoned for the period of twenty days, and be fined the sum of $250.

(4) That Hannah Chrisman be fined the sum of $250.

Ordered accordingly.