JOSEPH MICHAELS et al., Plaintiffs, *v.* SIDNEY HILLMAN, Individually and as President of the AMALGAMATED CLOTHING WORKERS OF AMERICA, et al., Defendants.

(Supreme Court, Monroe Trial Term, June, 1920.)

Injunction — when permanent injunction granted — conspiracy — labor unions — damages — picketing.

> A concert of action by a labor organization and its members to compel recognition of a union or to redress grievances by means of threats, intimidation, force, violence or similar coercive measures, constitutes a conspiracy, whether such intention was present at the inception of a strike called by the organization or afterward.

> Where the officers and agents of a national unincorporated labor union, acting within the scope of their authority as such, call and carry on a strike with the intention of using such unlawful means and use such means, the labor union is liable for damages but the liability does not extend to such of its individual members as are not specially connected with such acts.

> Where picketing involving threats and intimidations, force, violence and other coercive measures was employed by the officers and agents of the "Amalgamated Clothing Workers of America" who declared a strike in plaintiffs' factories in order to bring them under the control of said organization, in consequence of which a large number of plaintiffs' employees quit work and the operation of the factories was crippled and the business imperiled, the plaintiffs who were endeavoring to keep their shop a non-union one will be granted judgment for a permanent injunction restraining the defendants from the commission of such acts to compel recognition of the organization.

ACTION for an injunction and damages.

Sutherland & Dwyer, for plaintiffs.

O'Brien & Powell (George A. Benton, Felix Frankfurter, Emory R. Buckner, Gerard C. Henderson, Robert Szold, Max Lowenthal, of counsel), for defendants.

RODENBECK, J.   The conflict in this case began when the Amalgamated Clothing Workers of America sought to compel recognition of its organization by the plaintiffs.   The plaintiffs had been maintaining a non-union shop and were endeavoring to keep it such. Ever since its experience with the local union of the United Garment Workers, affiliated with the American Federation of Labor, and the breaking down of that union in Rochester in 1915, the plaintiffs had avoided affiliating with any outside union and particularly with the Amalgamated Clothing Workers which was the outgrowth of one of the seceding wings of the United Garment Workers.   When the other clothing manufacturers in Rochester made a contract with the Amalgamated Clothing Workers in 1919, the plaintiffs refused to unite in the movement and from that time on it became a thorn in the side of that organization. The plaintiffs were compelled of course by the necessities of the labor market to meet the competition as to labor of the other clothing manufacturers but it could outbid them and this might put the Amalgamated Clothing Workers in the uncomfortable position of not securing for its members advantages enjoyed by the non-union workers in the plaintiffs' factories.   The only relief open to the Amalgamated Clothing Workers was to bring the plaintiffs' factories under the control of their organization.   The policy of the plaintiffs was opposed to this course and this diversity of interests was the cause of the conflict which subsequently led to a breach by the defendants of the law applicable to the relations of these parties.

Each side had its legal rights with respect to the initial controversy.   The plaintiffs had the right to endeavor to keep their factory non-union with a shop instead of an outside union organization which included the right to request their employees not to

join an outside organization and to discharge them for so doing. *Adair* v. *United States,* 208 U. S. 161; *Coppage* v. *Kansas,* 236 id. 1; *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 id. 229. The Amalgamated Clothing Workers had the right to endeavor to organize the plaintiffs' factories which included the right to invade the ranks of plaintiffs' employees, to secure members, to strike to enforce this right to seek to win over others to their support, to issue circulars truthfully setting forth the circumstances of the strike, to solicit funds to support the strike and to appeal to friends and sympathizers for lawful assistance, provided that no fraud, threats, intimidations, violence or other coercive or unlawful measures were employed.

Up to the time of the strike there was no occasion for the intervention of the law but now the Amalgamated Clothing Workers decided upon a course of action which brought them into conflict with the rules of law applicable to this subject in this state. The organization determined to force the plaintiffs to recognize the union. It had secured a membership of about two hundred of a total working force in plaintiffs' factories of about one thousand employees and with this nucleus, using as a pretext the Messina incident which was insufficient as a matter of law, a claim for back pay which was unjustifiable upon any legal grounds and a claim for increased pay which was not warranted by the prevailing wages, it declared an economic war on the plaintiffs and called a strike. Those of its members who were employed by the plaintiffs, although they had secretly joined the union, knowing of the wishes of the plaintiffs to keep their factories free from the influence of the Amalgamated Clothing Workers, had the legal right to quit work as they had the legal right to join the union, however

Supreme Court, June, 1920.        [Vol. 112.

their conduct might be viewed from an ethical stand-
point under the circumstances.

These men and women, many of whom had been in
the employ of the plaintiffs for years, struck to com-
pel the plaintiffs to recognize the Amalgamated Cloth-
ing Workers in order to secure a more effective means
of collective bargaining than a shop organization
afforded. Their wages, hours and working condi-
tions, except as to the existence of a union of the
Amalgamated Clothing Workers, were the same as in
other factories in Rochester where that association
was recognized. If the strike was not successful they
could either get their old places back or obtain new
ones as they have done since the strike began and
they would be as well off or better than before the
strike and meanwhile they would be receiving strike
benefits, but the plaintiffs had at stake a business
which had been sixty years in building which might be
ruined if, through the strike, their production could
be curtailed sufficiently to divert their trade to other
channels. Indeed, one or more of the leaders of the
strike said that they would put the plaintiffs out of
business and would not call the strike off until the
plaintiffs had turned over the keys of their factories.
The plaintiffs were required to win their way in the
world of business by hard and honest competition and
by the quality and character of their goods but the
Amalgamated Clothing Workers instead of endeavor-
ing to secure recognition by an example of an enlight-
ened and reasonable administration in other factories,
chose to force their way into plaintiffs' factories by
secrecy and by a strike backed by its powerful
influence and supported by acts that the law con-
demns. Ultimate success in the labor movement does
not lie along this line but in the direction of a peaceful
exemplification of a just and reasonable administra-

tion of the affairs of the union with advantages not only to employers and employees but to the public as well.

Plaintiffs' employees were not bound to remain in their employ any more than the plaintiffs were bound to retain them in their employ. The rights of the parties are on a par in this respect. It has not thus far in human affairs appealed to the sense of justice to require a man to keep another in his employ who can leave that employ at any time. The right to discharge and the right to quit work must be reciprocal until some other equitable basis of employment than the open market is established. If the members in plaintiffs' employ had quit and struck and stopped there, no cause would have been presented for legal intervention as the plaintiffs had the option of supplying the vacant places with other help, or, if they could not do so, of discontinuing business. But the Amalgamated Clothing Workers and the defendants were not satisfied merely to deprive the plaintiffs of an economic need by having its members quit work but set out to prevent plaintiffs from filling with others the places of those who left and to cause those who remained at work to leave plaintiffs' employ. It is idle to say that this was not the purpose of the Amalgamated Clothing Workers. The strike would have been useless without these further measures and every one with any experience in human affairs and with any knowledge of human nature knows that it was in the minds of the leaders of the strike to follow it up with such efficient means as might be necessary to make it effective and force the plaintiffs to succumb to the wishes of the Amalgamated Clothing Workers. If the plaintiffs had been unmolested the places of those employees who quit work would soon have been supplied and the factories would have gone on as before and so the

defendants planned a course of action to supplement the strike which would force the plaintiffs to recognize the Amalgamated Clothing Workers and remove the irritating position in which they found themselves in Rochester with substantially all of the clothing manufacturers affiliated with them except the plaintiffs.

With this situation confronting them the Amalgamated Clothing Workers decided to secure members in the plaintiffs' factories with a view to forcing recognition of the union upon the plaintiffs. These efforts were secretly carried on with knowledge of the attitude of the plaintiffs toward the union. A petition was circulated in one of the factories during working hours contrary to the rules of the plaintiffs. Meetings were held clandestinely by those who had joined the union and the whole movement was kept under cover until such time as a sufficient number of members had been secured to give authority to any demands and to make a strike effective. Meanwhile the plaintiffs had become aware of the efforts that were being made and were taking steps to render them abortive. They sought to discover who of its employees were joining the organization and were discharging those who were known to have joined or who were active in soliciting members or otherwise suspected of furthering the movement. This action of the plaintiffs in the eyes of the leaders of the Amalgamated Clothing Workers put a penalty upon membership in their organization and was accepted as a grievance although the organization had invaded the factory against the known wishes of the plaintiffs. The refusal of the plaintiffs to permit the Amalgamated Clothing Workers unmolested to unionize their factories and the exercise of their right to discharge those of its employees who affiliated with the Amalgamated Clothing Work-

ers was the cause of the challenge by way of a strike which the Amalgamated Clothing Workers tendered to the plaintiffs.

It is folly to say that this program was not conceived by the national organization and was not carried on by its representatives for the purpose of strengthening strategically the position of the local union in Rochester and in addition the power of the national organization in the industry. And with this thought in mind the joint board representing nominally the local unions in Rochester but in fact the national organization declared a strike in plaintiffs' factories and a large number of their employees quit work and others left subsequently for one reason or another until a very substantial portion of the employees had quit, the operation of the factories was crippled and the business was imperiled. The committee of plaintiffs' employees appointed by the meeting of those who had joined the Amalgamated Clothing Workers were empowered to call a strike if the plaintiffs would not treat with them, that is, recognize the union which they had secretly joined, and the committee did not go to see the plaintiffs as invited to do by a letter read at the meeting but the manager of the joint board, not an employee of the plaintiffs, called up the plaintiffs on the telephone and reported back that the plaintiffs would not see the committee, whereas in fact the plaintiffs refused only to talk with the manager of the joint board who with the national organizers subsequently constituted a part of a committee in charge of the impending strike. The strike was staged by the manipulations of the national organization to force the recognition of the union. This is the only conclusion from the history of the controversy between the parties preceding the strike.

The case turns upon the question as to whether or

26.

not force or what is equivalent to force was employed by the defendants to secure this recognition. If no threats, intimidation, force, violence or other coercive measures were employed, the defendants are not liable for they were within their rights in seeking to compel recognition by calling a strike. But the record shows that such means were employed. The method of picketing involved threats and intimidation. Picketing may be lawful or unlawful. *Mills* v. *United States Printing Co.,* 99 App. Div. 605. The legitimate purpose of it is to inform the strikers and their union as to what is going on at the plants. When it unnecessarily goes beyond this and is conducted with the design and has the effect of intimidating those who may desire to remain at work or seek employment, it infringes upon human freedom and liberty of action. The right to work is protected by the law as well as the right to quit work. *Auburn Draying Co.* v. *Wardell,* 227 N. Y. 1, 8. Whatever number of pickets was necessary to secure the reasonable and lawful purpose of the union is sanctioned by law but where the number is swelled to 500 or 600 and at times to a thousand made up in part of workers from other factories, the unnecessary and unlawful purpose to awe and intimidate by numbers is apparent. Intimidation may consist in numbers alone without any actual violence. Many workers in plaintiffs' factories were girls and in such a case a large crowd of pickets composed in part of women of foreign birth, with the calling of opprobrious names and expressions and gesticulations of violence, would be sufficient alone to intimidate without a single blow being struck.

The picketing was not "peaceful." Names were called. Girls going to work had to pass through a line of pickets in the earlier stages of the strike and "scab" and other opprobrious names, too vile to

be mentioned, were called as they passed. No self-respecting woman would submit to such insults more than once and it is not surprising that from the day of the strike these methods were effective and large numbers who would otherwise have remained left the employ of the plaintiffs and others were deterred from seeking employment. So that the plaintiffs were reduced to the necessity of advertising for help and as soon as the unlawful picketing was checked the number of employees gradually increased until a full force of workers was secured.

Actual violence supplemented opprobrious epithets. There was no physical violence every day but that was hardly necessary. An overt act of this kind now and then would be a sufficient warning and a blow or disturbance now and then would be rumored about and be quite adequate as an object lesson. It is enough if violence was employed with sufficient frequency to warrant the conclusion that it was a part of the program for conducting the strike. There were actual assaults upon employees and interferences with and even attacks on the police. Twenty-nine arrests were made which represent, however, only a small fraction of the number of misdemeanors actually committed. The number of police deemed necessary on the ground and the necessity for reserves at the police station for emergencies indicate the temper of the so-called picketers and the condition that existed. If the leaders admonished the strikers not to indulge in violence, there is no evidence that they followed the advice or that anything was done by the union to punish the offenders. They created a situation from which violence might be expected by congregating unnecessary crowds at the factories and must take the full responsibility for the results and cannot be heard to exculpate themselves by the claim of advice given that was

not heeded. The speeches made at the general meeting at Convention Hall show that the temper of the leaders was no more moderate than that of the rank and file of the workers and these speeches were well calculated to lead them to believe that their conduct was not disapproved.

The defendants sought to interfere also with the contract of the United Garment Workers. While the strike was in progress the plaintiffs' employees in large numbers joined the United Garment Workers affiliated with the American Federation of Labor but the strike and its methods continued just the same. The Amalgamated Clothing Workers were not satisfied with the unionization of the factories by the establishment of a local of the United Garment Workers but, on the contrary, continued the strike with renewed vigor and zeal as if the principle of an outside organization contended for had not been accomplished. These acts of the defendants in relation to the United Garment Workers furnish no ground for a cause of action (*Posner Co., Inc.,* v. *Jackson,* 223 N. Y. 325; *Lamb* v. *Cheney & Son,* 227 id. 418) but serve to illuminate the motives of the defendants and to emphasize the competition among labor unions and their selfish attitude toward each other. If all that was sought was the unionization of the plaintiffs' shops the Amalgamated Clothing Workers should have desisted when the United Garment Workers were recognized and a local union established. A United Garment Workers union was under the ban by the defendants as well as a shop organization. Salvation, it seems, could be secured only through the upbuilding of an organization represented by the defendants. The United Garment Workers had as much right on the ground as did the Amalgamated Clothing Workers. The latter has no patent right on unionism. This intolerant atti-

tude of the Amalgamated Clothing Workers toward the United Garment Workers savors of a species of domination which does not inspire confidence in their ultimate purposes. If the Amalgamated Clothing Workers could obtain complete control of the labor market and the clothing manufacturers could combine into a perfect monopoly, wages and prices could be regulated to suit themselves at the expense of the general public and if the same policy could be pursued in other industries the principle of organization contended for would defeat its own purpose so far as the wages are concerned by raising prices as fast as the cost of production was increased. In a proper case the law will protect the general public as well as the individual from exaction and oppression from any source. "It is the duty of government to protect the one against the many as well as the many against the one." *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 439. Monopolies and exclusive privileges are alike condemned whether accomplished by combinations of labor or capital. *Curran* v. *Galen,* 152 N. Y. 33. The law is opposed to all monopolies whether of labor or capital as experience has taught mankind that an economic or industrial despotism has no more consideration for the general good than a political despotism and is an undue barrier to the exercise of the personal liberty and freedom of action, the development of industries and reasonable competition in life.

But not only were the Amalgamated Clothing Workers opposed to the unionization of the plaintiffs' factories by the United Garment Workers but they were unwilling that independent contractors and home workers who were making garments for the plaintiffs should have the privilege of working for the plaintiffs. The members of the union had the right to refuse to work with non-union men (*National Pro. Assn.* v. *Cumming,*

170 N. Y. 315) or to work on non-union material in the contractors' shops (*Bossert* v. *Dhuy*, 221 id. 342), but the defendants did not stop there but called a strike in some cases where but a handful of employees of the contractor belonged to the union. The strikes were not effective generally but they illustrate the extent to which the principle of the right to unionize is claimed to extend. Some of these contractors were engaged in making other garments as well as those of the plaintiffs but the defendants would paralyze the entire shop if they could do so to accomplish their purpose. If this principle is carried to its logical conclusion it would authorize a strike against any person or firm who did any work for plaintiffs in carrying on their business. House workers were persuaded by promises of strike benefits or by still more effective measures to quit working for the plaintiffs.

Thus by means that were in part lawful but in most part illegal, the defendants have sought economically to strangle the plaintiffs' business in order to compel them to recognize an organization against their wishes. " Employees who have struck, will not be permitted, though it might subdue their late employer, to coerce dealers and users into starving his business." *Iron Moulders Union* v. *Allis-Chalmers Co.*, 166 Fed. Repr. 45, 51; *Auburn Draying Co.* v. *Wardell, supra.* The law should favor the lawful purposes of unionization but " rights that are lawful and purposes that are useful and just cannot, however, be effectuated and accomplished by unlawful means." *Auburn Draying Co.* v. *Wardell, supra.*

The use of force or its equivalent goes back to the beginning of the strike and under the history and circumstances of the case justifies a conclusion that such means were contemplated and intended when the strike was called. This purpose makes the strike illegal in

its inception. A strike may be lawful or unlawful according to the motives or intention of the strikers. *Curran* v. *Galen, supra; Davis* v. *Zimmerman,* 91 Hun, 489. It may be an illegal conspiracy in its inception if it is a " combination to do an illegal act by legal means or any act by illegal means." *Nat. Pro. Assn.* v. *Cumming, supra.* The motives of a small group of strikers in calling a strike may be so unimportant as not to require discussion, but when the strike is participated in by large numbers assisted by workers from other industries and directed by a powerful labor organization the motive or intention becomes of prime importance. The ultimate motives in this case were unquestionably to benefit the Amalgamated Clothing Workers and those employed by plaintiffs who had joined its ranks, but the immediate intention was the exercise of compulsion by means that were unlawful. The distinction between motive and intent is illustrated by Wigmore where he says that a man's motive in shooting at a bird may be to obtain food while his intention is to kill it. Wigm. Ev. § 302. So here the strike is to be condemned though its motives were to benefit the union and its members if the intention was to accomplish that end by the use of threats, intimidation, force, violence or other similar coercive measures. A conspiracy of two or more persons " to prevent another from exercising a lawful trade or calling * * * by force, threats, intimidation, or by interfering or threatening to interfere with * * * property belonging to or used by another, or with the use or employment thereof " is condemned by the statutes of the state. Penal Law, § 580, subd. 5. A union cannot call a lawful strike with the intention of using such means to bring it to a successful issue. This rule is fortified in this case by the tremendous power back of the Amalgamated Clothing Workers,

the situation of the labor market in the clothing indus-
try in Rochester and the unison of action with which
the strike was immediately prosecuted. The law will
not be defeated by the failure to express such inten-
tions in writing or in preliminary oral representations,
but will, in a proper case, infer such intentions from
the history of the case, the prompt application of
unlawful methods after the strike has been called and
the general conduct of the parties. It would be
absurd to say that a group of men could combine for
the purpose of using force or its equivalent to compel
others to give up jobs or to prevent others from seeking
employment whether the combination be called a strike
or a conspiracy. It is a fair conclusion that the national
organization was cognizant all the time of what was
going on and that what happened occurred in accord-
ance with its plan to compel recognition of the union.
If the defendants, therefore, intended when the strike
was called to use threats, intimidation, force, violence
or other coercive measures to induce plaintiffs'
employees to leave its employ and to prevent others
from taking their places in order to compel recogni-
tion of the union, their purpose was illegal and ren-
dered them liable if united in action from the incep-
tion of the strike for such damages as the plaintiffs
suffered. But if this intention was not present when
the strike was called the defendants would still be
jointly liable for the use of force or its equivalent when
employed if they acted in concert.

The defendants sought to justify their course by evi-
dence of the lawful purposes of the Amalgamated
Clothing Workers and their beneficial operations, but
the evidence was excluded on the ground that the law-
ful purposes of the organization would be assumed
until the evidence to the contrary was offered (*Lawlor
v. Loewe*, 209 Fed. Repr. 721, 727; *Russell & Sons* v.

*Stampers & G. Local Union,* 57 Misc. Rep. 96) and that the beneficial character and operations of the union were no justification. *Noonan* v. *Luther,* 206 N. Y. 105; *Zucker* v. *Whitridge,* 205 id. 50. Such evidence was no more admissible than would be evidence of the character and reputation or the benevolent or charitable acts of an individual to mitigate or justify his civil wrong. The right to seek by lawful means to unionize the plaintiffs' factories (*Jacobs* v. *Cohen,* 183 N. Y. 207; *Kissam* v. *United States Printing Co.,* 199 id. 76), and to compel recognition by a strike, must be conceded and the alleged justification could only have been offered upon the broad ground that a balancing of advantages and disadvantages to employer and employees should in some way permit the course taken by the defendants. The law of this state has properly been liberal towards the rights of workers to unionize and to enforce their demands by a strike, for this is the most effective weapon that they have, but it cannot go to the extent of permitting force or its equivalent to be employed. Such a concession would result in a state of private war every time a stubborn strike is carried on. This government is founded upon the theory of equal rights and equal opportunities to all, of personal liberty and freedom of action of individuals. It was a protest against personal and political domination of individual thought and action, and this spirit has shaped and colored all our laws. There has been a constant effort to preserve the character of our institutions and to condemn monopolies of all kinds as an undue interference with the fundamental principles of government. The government itself is restrained by checks and balances designed to prevent the growth of arbitrary power. No particular class or group whether of labor or capital can be permitted to dominate any other class or group or the general

public to the exclusion of their reasonable rights. *Hitchman Coal & Coke Co.* v. *Mitchell, supra.* The widest latitude should be offered to workers to improve their condition by organization, but in the extension of their privileges the reasonable rights of others guaranteed to all alike must not be subverted if the spirit of the government is to be preserved. These privileges of the workers will be modified as time passes so as to enlarge the opportunities to improve their condition, but it can only be done by acquiring the confidence of the general public that the changes are in the interest of the common good and that the workers through their unions can be trusted to exercise them equitably by lawful means and not through force or violence or similar measures. The trend of public sentiment is and has been to increase the rights and privileges of the workers, to give them a larger share in the increment of production, to make their employment more secure, to shorten their hours, to improve their working conditions, to alleviate the hazards and hardships of their employment and to guarantee them against the impairment of their capacity to labor by accident, sickness or old age, but it has not reached that point where these things can be brought about by the use of force or its equivalent which would be destructive of all rights and would make insecure the very rights which are sought to be obtained thereby. These rights and privileges cannot be extended so as to constitute an arbitrary domination of the reasonable rights of others or so as to be subversive of the government itself or so as to be contrary to the public interests. All people, classes or groups of people within the jurisdiction of this government are subject without discrimination to law, and when any class or group seeks to place itself above the law or seeks arbitrarily to control the law, such conduct

is a species of disregard for authority represented by the law which amounts to disloyalty to the government. So long as this government exists such conduct should be and will be reproved by the public and repressed by the law when a proper case presents itself or the government must fail and chaos and anarchy take its place. Combinations both of labor and capital not amounting to monopolies with reasonable restrictions upon both are beacon lights of future industrial progress and the limits of such combinations are the reasonable rights of others and the public under our form of government. As long as the government exists in its present form there must be the widest latitude of individual freedom of thought and action consistent with the public welfare.

The claim, therefore, that the plaintiffs should be required to recognize the union and that its refusal to do so was in some way a justification for what followed must be set aside and the rights of the parties must be determined by reference to what were the intentions of the defendants underlying the strike and what means were employed to carry it on, for if the strike was called with the intention of using the force or what amounted to it, which was actually employed in its prosecution, it was unlawfully conceived and carried on, and if the defendants were united in a concert of action they were engaged in a conspiracy. In the application of these rules each case rests upon its own facts and in this case the facts justify the conclusion that the strike was illegally conceived and unlawfully carried on by the defendants acting in concert. The intention of the defendants as in other cases is to be deduced from the history and circumstances of the case. The court cannot probe into the minds of the leaders of the strike and extract their intentions but must deduce it from the nature of the controversy, the

manner of calling the strike, the application of force after the strike, the temper of the speeches made and the general conduct of the parties. These all point to a determined purpose to compel the plaintiffs to recognize the union, not merely by the peaceful quitting of work and the calling of a strike, but by the use of force backed by the power, influence and resources of the national organization.

All of the defendants who acted in concert with respect to the illegal means conceived and employed are liable for damages occasioned thereby. The national organization must bear its share of the responsibility. It had two national organizers on the ground before the strike was called and it is a fair conclusion that they were directing the action of the joint board and the conduct of the strike in the interest of the national body. The national officers may not have been informed of the strike before it was called, but they had sent two national organizers to Rochester for no other purpose than to handle the situation which it is claimed was of more than local importance. The national organization cannot escape responsibility for a situation which through its direct representatives it took part in shaping and for acts in which through its organization it participated. The familiar rule that a principal is liable for the acts of his agent done in the course of his employment, applies to the national organization and its membership. 5 C. J. 1364. An organization of 175,000 members cannot escape responsibility because a direct personal connection cannot be traced between each individual member and the acts complained of. Such a body must act through agents just like a corporation and both are responsible for the authorized acts of such agents. The general executive board and the general president, acting under its direction, had the undoubted right to call the strike

(Amalgamated C. Workers const. art. VI, §§ 1, 13) and in sending national organizers to Rochester the organization must assume the responsibility for their acts. All of the defendants are liable who knew or ought to have known of the concerted action for the common object (*Lawlor* v. *Loewe, supra,* 727) and the national body is responsible as such, under the doctrine of agency. *Hitchman Coal & Coke Co.* v. *Mitchell, supra.* The calling of the strike was also ratified and its conduct sanctioned by the president of the Amalgamated Clothing Workers and the national organization must be held liable with the other defendants both for the initiation of the strike and its subsequent conduct. This responsibility, however, does not impose a personal liability upon the entire membership but only upon those who are named as defendants and personally participated, directly or indirectly, in the wrongful acts complained of. It was claimed that the situation in Rochester was of general concern to the organization and it cannot be successfully maintained that the strike was not a conception of the national organization in the interest of its general membership and especially its membership in Rochester. The meetings of its members employed by the plaintiffs and the actions of committees and the joint board were only the local machinery for putting the strike in operation. As soon as it was launched the national organization took an active and open part in conducting it through national representatives, including the president, and through financial assistance. It cannot be possible that a great organization like the Amalgamated Clothing Workers can project and carry on a strike in the manner in which is was conducted in this case and avoid responsibility and liability for its acts. A concert of action by a labor organization and its members to compel recognition of a union or to redress

grievances by means of threats, intimidation, force, violence or similar coercive measures constitutes a conspiracy, whether such intention was present at the inception of the strike or afterward, and a national unincorporated labor union is liable for damages if its officers and agents acting within the scope of their authority as such called and carried on the strike with the intention of using such unlawful means, and used such means, but the liability does not extend to the individual members who are not specially connected with such acts.

The plaintiffs are entitled to a permanent injunction restraining the defendants substantially in the terms of the temporary injunction heretofore granted and to damages to be hereafter determined.

Judgment accordingly.