**JOHNSON et al. v. J. H. YOST LUMBER CO. et al.**

**No. 11730.**

Circuit Court of Appeals, Eighth Circuit.

Jan. 21, 1941.

Rehearing Denied Feb. 14, 1941.

C. A. Sorensen and James A. Doyle, both of Lincoln, Neb., for appellants.

Paul Boslaugh, of Hastings, Neb., and Alfred G. Ellick and Daniel J. Gross, both of Omaha, Neb. (Lester Stiner, of Hastings, Neb., Robert Van Pelt, of Lincoln, Neb., E. B. Crofoot, of Omaha, Neb., George M. Rassieur, of St. Louis, Mo., Francis S. Gaines, of Omaha, Neb., and Harold A. Prince and William Suhr, both

of Grand Island, Neb., on the brief), for appellees.

Before STONE, GARDNER, and WOODROUGH, Circuit Judges.

GARDNER, Circuit Judge.

This was an action brought by appellants as plaintiffs below to recover treble damages from appellees for alleged injuries to plaintiffs' business and property by reason of a conspiracy, combination, plan, understanding, design, or concert of action in restraint of trade in contravention of the provisions of the Sherman Anti-Trust and Clayton Acts as amended. Title 15 U.S. C.A. §§ 1 to 15. We shall refer to the parties as they were designated below.

Plaintiffs are copartners engaged in the wholesale and retail lumber business under the name of Johnson Cash-Way Lumber Company. In May, 1931, plaintiff L. W. Johnson formed a partnership with O. G. Cousins, and they established business at Hastings, Nebraska. In the fall of 1932, this partnership was dissolved, and a new partnership was formed between L. W. Johnson and his father, F. J. Johnson. They have carried on the business at Hastings, Nebraska, and since June 1, 1935, at Grand Island, Nebraska. L. W. Johnson has been general manager, with resident managers at the two retail yards. Plaintiffs' business is the purchase and sale of lumber, cement, coal and building material. The sources from which they secure these commodities, which are indispensable in the conduct of their business, are situated in states other than Nebraska, and the business is necessarily and intimately related to interstate commerce. There are two groups of defendants, those engaged in the retail lumber business in Nebraska, and those engaged in supplying retailers of lumber and allied merchandise with what they need in the conduct of their business. Under the first group of defendants are: defendant John H. Yost and J. H. Yost Lumber Company, the latter being a Nebraska corporation operating a chain of retail lumber yards at various towns and cities in Nebraska, including the City of Grand Island; the Geer Company, a Nebraska corporation, engaged in the sale at wholesale and retail of building materials and coal at Grand Island, its business being since March 1, 1931, under the management and control of Russell Geer, president; the Sothman Company, a Nebraska corporation, with its principal place of business at Grand Island, Nebraska, where it sells coal, lumber and building supplies and where it manufactures and sells at wholesale and retail millwork and building specialties, it being known as the Goehring-Sothman Company until 1936; the Chicago Lumber Company, a Nebraska corporation, with its principal place of business at Omaha, Nebraska, operating a chain of lumber and coal yards, hardware stores and farm implement stores in many Nebraska cities, including Grand Island, Lawrence J. Simpson being vice president and general manager of the corporation since 1931, and during the same period Otto Schmidt being vice president in charge of the business at Grand Island.

Under the second group, known as supplier defendants, are: the Hawkeye Portland Cement Company, a manufacturer and seller of cement without factories or places of business in Nebraska; the Ash Grove Lime and Portland Cement Company, a Nebraska corporation, engaged in the manufacture and sale of Portland Cement and lime, with its principal place of business at Louisville, Nebraska, where its plant is located; the Nebraska Cement Company, a Delaware corporation, organized under the laws of that state in 1936 to succeed a Nebraska corporation of the same name and which manufactures and sells cement from its factory in Superior, Nebraska; the Missouri Portland Cement Company, a Missouri corporation, engaged in the manufacture of cement and the production of sand and gravel, with its main offices at St. Louis, Kansas City, and Memphis, its manufacturing plants being located in Missouri; the Johns-Manville Sales Corporation, a Delaware corporation, with its principal place of business in New York City, being engaged in the manufacture and sale at wholesale of building materials, its sales in Nebraska being supervised from a district office in St. Louis, Missouri.

The Johnson Cash-Way Lumber Company is commonly referred to as a "cut rate" or "cash and carry" lumber yard. The business policy of the company has been to sell its merchandise in all parts of Central and Western Nebraska in competition with other dealers and at prices lower than competitors if sales could be made at a profit. One of the plaintiffs defined such a "cut rate" yard as one that buys in the open market and sells its merchandise at a close margin of profit, depending for success upon a large volume of business. Plaintiffs' claim for damages is

for injury sustained to their business or property as a result of acts committed pursuant to a combination or conspiracy among the defendants to destroy their retail lumber, coal and building material business by means of persuasion, coercion and threats of boycott against manufacturers, producers, wholesalers and jobbers of cement, coal, lumber and building materials, the direct effect of which was to restrain, obstruct and cut off shipments of indispensable commodities from sources outside the State of Nebraska. It claims that the supplier defendants became co-conspirators with the retail lumber dealers by acquiescing and participating in the object and plan of the lumber companies by refusing to sell supplies and commodities to the plaintiffs in interstate commerce.

At the close of plaintiffs' testimony, the court sustained separate motions of the various defendants to direct a verdict in behalf of the defendants. Upon the verdict so returned, the court entered judgment dismissing plaintiffs' complaint on its merits, from which judgment plaintiffs prosecute this appeal, alleging error in granting the motions of the defendants for a directed verdict and also in sustaining objections to certain testimony offered by them during the trial of the action.

■ We must assume that the evidence established all facts that it reasonably tended to prove, and in considering the evidence, plaintiffs are entitled to all favorable inferences that may reasonably be deducible from the facts proven. Svenson v. Mutual Life Ins. Co., 8 Cir., 87 F.2d 441; Egan Chevrolet Co. v. Bruner, 8 Cir., 102 F.2d 373, 122 A.L.R. 987; Champlin Refining Co. v. Walker, 8 Cir., 113 F.2d 844.

■ Plaintiffs' sources of cement, coal and building materials are in the main outside the State of Nebraska. These materials are indispensable to their business. If the conspiracy of the retail lumber dealers resulted in the refusal of the supplier defendants to sell to plaintiffs, then there was an interference with interstate trade, the amount of commerce so affected being immaterial. Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Arkansas Wholesale Grocers'

Ass'n v. Federal Trade Commission, 8 Cir., 18 F.2d 866.

Was there proof of such facts and circumstances as to have warranted the jury in finding that there was an unlawful combination between the retail lumber dealers as claimed by the plaintiffs? There are many issues of fact which are rarely susceptible of direct proof. As said by the Supreme Court in Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 472, 83 L.Ed. 610, in discussing unlawful agreements: "As is usual in cases of alleged unlawful agreements to restrain commerce, the government is without the aid of direct testimony that the distributors entered into any agreement with each other to impose the restrictions upon subsequent-run exhibitors. In order to establish agreement it is compelled to rely on inferences drawn from the course of conduct of the alleged conspirators."

■ Where there is unanimity of action showing an initial desire or threat to seek or compel a certain result, there is sufficient evidence of the agreement, unless there is persuasive evidence to the contrary. Similarity of action by interested parties is not necessarily to be regarded as coincidence. Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534; Eastern States Retail Lumber Dealers' Ass'n v. United States, supra; Vitagraph, Inc. v. Perelman, 3 Cir., 95 F.2d 142.

Representatives of the retail lumber dealer defendants made declarations which, viewed in the light of the circumstances disclosed and the results achieved thereby, are substantial and cogent evidence of a conspiracy to restrain trade in interstate commerce with the plaintiffs. Some of these circumstances will suffice to illustrate our thought. In 1931, when it became known that plaintiffs intended to establish a "cut rate" lumber yard at Hastings, Nebraska, defendants J. H. Yost Lumber Company and Chicago Lumber Company, and others who were competitors in the retail lumber business, organized a rival retail yard known as the Consumers Lumber Company, to be situated on a site directly across the street from plaintiffs' lumber yard. Plaintiffs offered evidence, which, on objection of the defendants, was excluded, to establish that the lumber dealer group cooperated in the operation of the Consumers Lumber Company until 1934, and that its business practice was to under-

sell plaintiffs, even though sales were made at a loss, with the avowed purpose and manifest intent of driving plaintiffs out of the retail lumber business at Hastings. In 1934, Richard Goehring, manager of the Goehring-Sothman Company and Ted Martin, manager of the J. H. Yost Lumber Company, and one Cousins, called upon plaintiffs at Hastings, Nebraska, and requested them to conform their business policy to that of these defendants. Two conversations occurred during that day, one of which occurred after the defendants had conferred with the Hastings lumber dealers. Goehring warned plaintiffs that if they did not comply with the business policy of the defendants, they would be cut off of everything they tried to buy. Ted Martin said: "Larry, Yost has lots of money, you know, and he has a lot of friends among the wholesalers and a big buying power, so if you don't line up he will just cut you off of everything that you buy." This testimony was corroborated by two witnesses and is uncontradicted. Again, during 1934, the Hastings manager of the defendant J. H. Yost Lumber Company called upon plaintiffs and informed them that if they did not line up on prices they would be put out of business, concluding with the remark, "We have got you off of cement now and Yost can get you off of more materials than we have yet." This testimony was corroborated and uncontradicted. Early in 1935, Russell Geer, of the Geer Company, expressed dissatisfaction with the plaintiffs' competition in the sale of Johns-Manville products, and protested to Johns-Manville Sales Corporation. In an effort to settle any differences that existed, plaintiff L. W. Johnson called upon the Geer Company at Grand Island. On this occasion, Geer told L. W. Johnson that the defendants, the Sothman Company and the Chicago Lumber Company were "putting the heat on him," and that they had decided not to buy from anybody that sold to plaintiffs. Later in the same year, after plaintiffs had received a car of building materials from the Johns-Manville Sales Corporation at Grand Island, Geer informed plaintiffs that he would cease buying Johns-Manville products as long as that company sold to the plaintiffs. The defendant Johns-Manville Sales Corporation subsequently refused to accept and fill orders from the plaintiffs. In June, 1935, after plaintiffs opened their lumber yard at Grand Island, their agent purchased the property of the defunct Cousins Lumber Company. Thereupon, Mr. Goehring of the Sothman Company, called at plaintiffs' office and offered to buy the lumber yard and threatened that if plaintiffs did not sell or line up on prices, they would run them out of business, and further asserted that they would see that plaintiffs' lease would be taken away from them and they would bring further pressure to bear and cut them off of sources of materials. Goehring also said that they already had plaintiffs cut off of cement. A few days later Goehring returned and talked with one of the plaintiffs about lining up on prices or selling out to them. L. W. Johnson testified that he refused the offer to sell, whereupon Goehring threatened, "Larry, if you don't sell this yard to us or line up on the price like the rest of the dealers have done, you are going to find yourself up against the fastest bunch of fellows that you ever saw in your life. We are just going to take the ground right out from under you and cut you off from everything that it takes to run a lumber yard." Another witness to the conversation testified that Goehring said, "Unless you sell to us at our price we will have to cut you off of cement and we will jerk this ground directly out from underneath you." In 1938, plaintiff L. W. Johnson had a conversation with Lawrence Simpson, manager of defendant Chicago Lumber Company, in which Simpson said, "If you don't get yourself lined up here— we have got you shut off of some materials and we have got your Grand Island lumber yard on wheels and we will get your Hastings yard on wheels."

Plaintiffs were forced by the Union Pacific Railroad Company to vacate the site upon which the Grand Island lumber yard was situated. The lower court refused to permit plaintiffs to introduce testimony of Union Pacific officials to the effect that the defendant lumber dealers and many others acting in concert with them, deluged the railroad company with letters and telegrams, the originals of which plaintiffs sought to introduce, protesting against the leasing of a site upon the right of way in Grand Island to the plaintiffs. The evidence was rejected on the ground that it related to an intrastate transaction, but we think that it was admissible as having a bearing upon the alleged combination or conspiracy between the defendant lumber companies. When L. W. Johnson talked with the General Freight

Agent of the Union Pacific relative to the lease, he was told, "You can't imagine the amount of letters and complaints about this lease."

In the fall of 1934, plaintiffs sent to the defendant J. H. Yost Lumber Company in Hastings for a truck load of cement. The local manager of the Yost Lumber Company refused to make the sale, saying, "Oh, I think we have got you out of cement and we are going to keep you out." The supplier group of defendants refused to make shipments to the plaintiffs, though in many instances they accepted orders and made shipments to several competing dealers in both Grand Island and Hastings. None of the supplier group have ever refused to sell to any dealer in either of these cities, other than plaintiffs. The ascribed reason for refusing to make sales to the plaintiffs was pressure of the defendant lumber dealers, the loss of their patronage, and the fear of boycott. Thus, in 1934, the Missouri Portland Cement Company advised plaintiffs that although business with them "has been very satisfactory as far as we are concerned," yet, due to complaints from the dealers in Grand Island and Hastings, future business would have to be discontinued, and all future orders were declined. In 1935, the Ash Grove Lime and Portland Cement Company, in refusing to sell to plaintiffs, through its representative declared, "I can't sell you and you can't buy from anybody else, I don't think." Notwithstanding the large volume of business plaintiffs offered—in one instance an order of fifteen carloads—they were unable to make purchase. All the cement companies refused to sell and all assigned similar reasons. Plaintiffs were completely cut off from all available sources of cement and to a large extent from lumber, coal and building supplies.

This evidence offered by the plaintiffs was entitled, on motion for a directed verdict against them, to the most favorable construction. All inferences fairly deducible from the evidence must be drawn in their favor. As among the lumber dealers, there was not only coincidence of action but similarity of remarks and expressions, indicating not only an individual purpose to boycott 'but also a combination with others. The proof clearly points to a concert of action, and the burden of the evidence shifted to defendants to go forward with their testimony to ex-plain away or contradict this testimony if they were able so to do. Interstate Circuit Co. v. United States, supra.

It is urged that the admissions and declarations of defendants' representatives were not competent or binding on the defendants whom they purported to represent. Here, however, each defendant lumber company has been shown to have participated in the concert of action. The evidence standing without contradiction, is sufficient to sustain a finding that the lumber dealer group of defendants succeeded in their efforts to compel a boycott of the plaintiffs by the manufacturers and distributors of the commodities which the plaintiffs desired to purchase, particularly cement. Defendants contend that the declarations and statements relied upon by plaintiffs as showing a purpose to defeat plaintiffs' plan to develop and maintain their business were made by persons not shown to possess authority to bind their principals. The statements were made in the course of conferences and negotiations concerning the business of the plaintiffs, in which it is apparent that the defendant retailers had a great interest and concern. Defendants say: "The declarations relied upon as against the Yost Company were made by Martin and Rurup, the local yard managers at Grand Island and Hastings respectively; those concerning the Sothman Company were made by Goehring, the yard manager. * * * The statements concerning the Geer Company were made by Russell Geer, its president and general manager, and the statements concerning the Chicago Company were made by Lawrence Simpson, its vice president and general manager." These statements were all made in the course of conferences concerning the business of the corporations. All of these agents were general agents in charge of business, either locally or generally. As said by the New York Court of Appeals in Lowenstein v. Lombard, Ayres & Co., 164 N.Y. 324, 58 N.E. 44, 45: "Where an entire business is placed under the management of an agent, the authority of the agent may be presumed to be commensurate with the necessities of the situation."

Even though the making of declarations may not have been expressly authorized by the principal, yet if they were ordinary incidents of the position which the agent occupies, authorization will be implied. A person in a managerial

position will be called upon, in the performance of his duty, to adjust controversies and to make and receive admissions. All of these things must be done or performed by someone, and a corporation must ultimately act through an individual. Mechem on Agency, Vol. 2, sec. 779; Ralston Purina Co. v. Novak, 8 Cir., 111 F.2d 631; Fletcher, Cyclopaedia of Corporations, Vol. 2, sec. 745; Egner v. Curtis, Towle & Paine Co., 96 Neb. 18, 146 N.W. 1032, L.R.A.1915A, 153. Each of these agents was charged with the continuous management of the business of his principal. The jury might well have concluded that the local managers for their localities were general managers. Restatement of Agency, Vol. 1, sec. 3. The subject of the conversations related in a vital way to the successful prosecution of the very business entrusted to them. As the record now stands, we are of the view that they were acting within the scope of their apparent authority, and their declarations were binding upon their principals.

 It is urged that the court erred in rejecting evidence relating to the organization, purpose and business of the Consumers Lumber Company by the defendant lumber companies. We have already adverted to this ruling of the court. The court also excluded evidence pertaining to the use by defendant lumber companies of threats and coercion to compel the Union Pacific Railroad Company to cancel plaintiffs' lease at Grand Island or to refuse to recognize plaintiffs as assignees of that lease. We think the evidence should have gone to the jury for their consideration. It at least had a bearing on the intent of the lumber dealers and their objects and methods of achieving their ends. Greater New York Live Poultry Chamber of Commerce v. United States, 2 Cir., 47 F.2d 156; Bedford Cut Stone Company v. Journeymen Stone Cutters' Ass'n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Devoe v. United States, 8 Cir., 103 F.2d 584. The mere fact that some of the proffered evidence extended beyond the applicable statute of limitations is no reason for rejecting it, if otherwise it is pertinent to the issue of conspiracy. Baush Machine Tool Co. v. Aluminum Company, 2 Cir., 72 F.2d 236; Standard Oil Company v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734; Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450, Ann.Cas.1914C, 128. Nor is the investigation of the acts of the alleged conspirators prevented because from 1931 to the fall of 1932 the co-partners were different. The conspiracy may or may not have been the same. It may have been a continuing one even though only two of the defendants joined. Others could join later, or it may have been a part of the same conspiracy. The evidence, we think, was admissible, and will reveal its own relevancy. Exchange Bank v. Moss, 8 Cir., 149 F. 340.

 Letters from the Lumbermen's Brick and Supply Company and the Fairchild Clay Products Company were excluded. The first named company, as the exclusive sales agent for the latter, insisted that further sales to the plaintiffs would be discontinued because of objections of the defendant lumber dealers. A letter to the Geer Company, containing assurances of the discontinuance of business with the plaintiffs and a request that the letter be shown to representatives of the Chicago Lumber Company and the Sothman Company, was also excluded. This evidence, we think, was admissible, at least as showing the effect of the acts of the conspirators. Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341.

 We are of the view that the court erred in granting the motion of the retail lumber dealers for a directed verdict in their favor.

It remains to consider the ruling of the court in directing a verdict in favor of the supplier group of defendants. All of these defendants sold their products to dealers in Hastings and Grand Island and elsewhere. Prior to the time plaintiffs opened their yard at Grand Island in 1935, they were able to obtain cement and also the Johns-Manville products. The Ash Grove, Nebraska, and Hawkeye companies always refused to sell to plaintiffs. The Missouri Portland sold plaintiffs until 1934. Johns-Manville sold plaintiffs from 1932 to 1935, but discontinued after plaintiffs opened their yard at Grand Island. It is not alleged nor claimed by the plaintiffs that these defendants had anything to do with the organization of the alleged conspiracy. The conspiracy charge against them is based on an alleged agreement not to sell to plaintiffs had between them and certain dealers. It is not based upon any agreement between these defendants them-

selves. There is no direct evidence of any agreement between either of these defendants and the dealers, but such agreement is sought to be shown by circumstantial evidence. It may be gathered from the pleadings and the argument of counsel based upon the evidence, that plaintiffs base their claim of proof of conspiracy upon the alleged facts (1) that these defendants simultaneously refused to sell to plaintiffs; (2) that they were deterred from selling by the pressure and threats of the lumber dealers; and (3) that they knew other suppliers were refusing to sell for the same reason.

In the final analysis, the claim is that these defendants were coerced by defendant dealers, and as a result of that coercion they declined to sell plaintiffs. From this plaintiffs conclude that a conspiracy existed between all of the defendants. It must be borne in mind that one engaged in private enterprise may select his own customers, and in the absence of an illegal agreement, may sell or refuse to sell to a customer for good cause or for no cause whatever. The Clayton Act itself specifically provides: "That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade." 15 U.S.C.A. § 13.

The combination and conspiracy charged against the lumber dealers was a combination to deflect the natural course of trade. Such a combination is not only an unlawful invasion of the rights of the parties at whom the concert of action is aimed, but also of the parties who are to be coerced into refusing business relations with them. Assuming that plaintiffs were customers of the supplier defendants, the combination of the lumber dealers was directed to preventing plaintiffs from having business relations with the supplier defendants. This combination prevented these defendants from selecting their own customers. The decisions of the Supreme Court abound in expressions to the effect that, "The trader or manufacturer, on the other hand, carries on an entirely private business and may sell to whom he pleases." From the mere fact of refusing to sell to plaintiffs, there can therefore arise no inference of an unlawful agreement, because one may lawfully select his own customers. Great

Atlantic & Pacific Tea Co. v. Cream of Wheat Co., 2 Cir., 227 F. 46; Union Pacific Coal Co. v. United States, 8 Cir., 173 F. 737; United States v. Colgate & Company, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443; Federal Trade Commission v. Beech-Nut Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; Federal Trade Commission v. Raymond Bros.-Clark Co., 263 U.S. 565, 44 S.Ct. 162, 68 L.Ed. 448, 30 A.L.R. 1114; Kissam v. United States Printing Company, 99 App.Div. 605, 91 N.Y.S. 185. There must be substantial evidence furnishing some basis from which the alleged fact of such an agreement may reasonably be inferred. A fraudulent conspiracy may be shown by circumstantial evidence, but the facts and circumstances relied upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion. Here, it appears that a number of these defendants had already refused to sell the plaintiffs even before the date of the alleged conspiracy. Others thought it bad business to sell them, and as plaintiffs themselves alleged, these defendants were coerced. Where there were two dealers in the same product at the same city, it was not thought good business to sell to both plaintiffs and the other dealer. In most instances, the other dealer had been handling the products before the arrival of plaintiffs. In some cases, plaintiffs had invaded the trade territory of established dealers handling products of these suppliers, and that was at least distasteful to these defendants and there seemed to have been ample reason of a business character for the suppliers to refuse to sell to plaintiffs.

In Federal Trade Commission v. Beech-Nut Company, supra, 257 U.S. 441, 42 S.Ct. 154, 66 L.Ed. 307, 19 A.L.R. 882, the court held that the facts found went beyond the simple refusal to sell goods to persons who would not sell at stated prices. The court particularly pointed out that under the Sherman Act, 15 U.S.C.A. §§ 1-7, 15 note, a trader was not guilty of violating its terms "who simply refuses to sell to others, and he may withhold his goods from those who will not sell them at the prices which he fixes for their resale. He may not, consistently with the act, go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade."

 We have already referred to the rejected evidence. None of this was of such a character as to affect the liability of the supplier defendants. As to them, the proffered evidence was not material. There is here no substantial evidence introduced or proffered that these defendants have gone beyond the simple refusal to sell their goods for reasons which were sufficient to them and which appeal to one as having substantial basis in reason. While their acts in refusing to sell were similar, yet a fair and logical inference from the evidence is that as pressure was brought to bear on them, they from business necessity and self-interest declined to sell to plaintiffs. As to some of these defendants there were other reasonable explanations, but liability on their part could only result from a knowing participation in the combination of retail dealers. Interstate Circuit v. United States, supra. There is no evidence, direct or circumstantial, showing such knowledge. It was not enough to establish a cause of action against them to show that there was a conspiracy among the lumber dealers to prevent plaintiffs from securing supplies sold by this group of defendants, in the absence of evidence that these defendants knew there was such a conspiracy. They refused to sell plaintiffs because they feared such act would displease their other customers, causing loss of their business. They perhaps knew that other suppliers were refusing presumably for like reasons.

In a recent case, United States v. Falcone, et al., 61 S.Ct. 204, 205, 85 L.Ed. ——, opinion filed December 9, 1940, the Supreme Court considered the sufficiency of proof to convict one who sells materials with knowledge that they are intended for use or will be used in the production of illicit distilled spirits as co-conspirators with the distiller who conspired with others to distill spirits in violation of the revenue laws. It was there contended that one who with knowledge of a conspiracy to distill illicit spirits sells materials to a conspirator, knowing that they will be used in the distilling, is himself guilty of the conspiracy. In disposing of this contention, the court said: "In the case of Alberico, as in the case of Nicholas Nole, the jury could have found that he knew that one of their customers who is an unconvicted defendant was using the purchased material in illicit distilling. But it could not be inferred from that or from the casual and unexplained meetings of some of respondents with others who were convicted as conspirators that respondents knew of the conspiracy. * * * and one who without more furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a party but of which the supplier had no knowledge."

So here, the refusal of the supplier defendants to sell to the plaintiffs may have furthered the object of the conspiracy charged, but it did not prove that the suppliers knew of the conspiracy.

It follows that the court correctly directed a verdict in favor of the supplier defendants. The judgment appealed from is therefore reversed as to the retail dealers, and the cause is remanded, with directions to grant plaintiffs a new trial as to said defendants, and as to the supplier defendants the judgment appealed from is affirmed.