[Civ. No. 22084. Second Dist., Div. Two. Oct. 4, 1957.]

A. B. C. DISTRIBUTING COMPANY (a Corporation), Appellant, v. DISTILLERS DISTRIBUTING CORPORATION (a Corporation) et al., Respondents.

J. Albert Hutchinson for Appellant.

Lawler, Felix & Hall and John M. Hall for Respondents.

MOORE, P. J.—Appeal from a judgment or order of dismissal entered after motion for nonsuit had been granted and from the judgment for costs.

Plaintiff is a licensed importer. It purchases from manufacturers and other distributors alcoholic beverages for resale to retail dealers.

Defendant Distillers Distributing Corporation, herein re-

ferred to as "Distillers" is by virtue of successive mergers, successor to Calvert Distillers Corporation. Both are herein referred to as "Calvert." Defendant Chivas Brothers Import Corporation is referred to as "Chivas."

There are five causes of action which compositely seek an accounting, damages and injunctive relief by reason of alleged unfair competition and, also, damages for alleged breach of contract. Count 1 charges an unlawful restraint of trade and unfair competition on the part of both defendants; counts 2 and 4 seek declarations of plaintiff's rights as to each of the defendants but both counts were on motion of plaintiff dismissed.[1] Count 3 alleges damages caused by Calvert by reason of its repudiation of its written contract; count 5 alleges damages caused by Chivas for breach of its oral agreement. The gravamen of the several counts "is the appropriation of plaintiff's business by defendants and certain of their favored customers, pursuant to a pre-existing and continuing combination and conspiracy to restrain trade in, and to monopolize the distribution of, alcoholic beverages—in general and in plaintiff's area of operation—and the deprivation of profits and good will by means of wrongful refusal to deliver supplies for resale in accordance with contracts between the immediate parties."

### COUNT 1

Count 1 alleges the corporate existence of Distillers and its authority to do business in California; its successorship to Calvert by way of merger and declares that the transactions alleged were had with Calvert and Chivas; that plaintiff is the holder of all licenses necessary to permit it "to engage in the wholesale distributing of alcoholic beverages within the State of California"; and is so engaged in such business principally within the county of Los Angeles; that defendants are licensed to be and "are engaged in the manufacture, importation, exportation and sale of alcoholic beverages in foreign and interstate commerce within the United States"

---

[1]Plaintiff urges that the dismissal was forced by the court's stated intention to try the declaratory relief issues first and in the absence of the jury. Plaintiff urges error in the ruling of the court in view of the decision of the Supreme Court in *State Farm etc. Ins. Co.* v. *Superior Court,* 47 Cal.2d 428, 431 [304 P.2d 13], filed after the trial in the instant action. But it is not necessary to pass upon that question in view of our conclusion. Even if the declaratory relief issues had been presented to the jury and they had returned a verdict declaring that plaintiff had an option to renew the contract, such verdict would have been patently erroneous. Therefore, even if the court's ruling was erroneous, plaintiff suffered no prejudice thereby.

and to the extent licensed have so engaged in such lines in the State of California; that defendants do not manufacture distilled spirits within California; that defendants are not authorized to conduct or participate in transactions respecting alcoholic beverages "with persons licensed to sell alcoholic beverages at retail to unlicensed persons."

That defendants import and manufacture a large number of "distilled spirits products" of the varieties customarily purchased by the consuming public and competitive with defendants' principal competitors as to variety, quality and price range; that such products are sold in containers bearing labels and trade-marks owned and controlled by defendants and unavailable from any other source; that defendants distribute and sell a substantial proportion of all the potable distilled spirits sold and consumed in the United States; that certain of said products have been advertised and have had customer acceptance whereas others have not been so advertised; that there is a tendency of the purchasing public to continue the use of products known to it and a reluctance to accept new products of the same general kind as a substitute therefor; that from time to time certain of defendants' products have been in short supply and have been allocated to their wholesale customers by some means unknown to plaintiff; that defendants have adopted the policy of distributing their products "as a group sometimes known as each respective defendant's 'line,' indifferently to the demand, customer acceptance, quality, price and competitive advantage or particular products" and have attempted to require the purchase of unpopular products as a condition to the purchase or allocation of acceptable products and have required their distributors to maintain in advance large stocks; "that at all times defendants have determined, declared and controlled the prices from time to time to be charged by them of their immediate purchasers and by their purchasers upon resale thereby by means of contract provisions, implied agreements, arrangements, recording, and causing the recording thereof, and by other means."

That at all times defendants distributed their products through licensed wholesale distributors; that defendants employed salesmen known as "specialty" men who visited customers of the distributors, solicited orders and submitted the same to the distributors for delivery; that for this purpose defendants sought to discover the identity of the customers of such distributors.

That prior to 1945, one Moyer was doing business as A.B.C. Distributing Company and was the distributor for Calvert; that during 1945 plaintiff entered into negotiations with Moyer "for the purchase of the business, stocks, good will, accounts, customer lists and physical properties and distributorships of Moyer"; that during such negotiations, in response to plaintiff's inquiry, "defendants expressly and affirmatively assured and represented to plaintiff that, in the event of the purchase of said business of Moyer by plaintiff, said defendants would appoint plaintiff their distributor in place and instead of Moyer and would continue the distribution of their said products by and through plaintiff as such distributor"; that on July 2, 1945, plaintiff purchased the business of Moyer and on the same day entered into an oral contract of distributorship with "said defendants"; that thereafter the contract was renewed from time to time to and including January 21, 1952; that on January 1, 1951, plaintiff entered into a similar oral distribution agreement with defendant Chivas for the distribution of Chivas products; that the Chivas contract was renewed, from time to time, to and including February 5, 1954; that both contracts have been duly performed by plaintiff.

That plaintiff, at its own expense, used its best efforts to increase the volume of sales of defendants' products and "to this end . . . expanded its facilities, increased the numbers of its employees and established additional suitable facilities"; that the purchase of defendants' products by plaintiff's customers progressively increased in volume and amount, "exceeding on the 1st day of January, 1952, annual purchases from plaintiff of defendants' products in excess of fifteen thousand five hundred (15,500) cases at sales prices in excess of plaintiff's cost of acquisition of One Hundred Thousand Dollars ($100,000) per year; and would have continued to so progressively increase in volume and amount in the absence of defendants' wrongful conduct, as hereinafter set forth."

That defendants are, and each of them, is "an affiliate and member of a combination of in excess of twenty corporations . . . engaged in the importation, manufacture and sale of alcoholic beverages in foreign and interstate commerce in the United States and in trade and commerce within the State of California"; that such combination "imports, manufactures and sells . . . in excess of twenty-five per cent (25%) of all alcoholic beverages" and that the aggregate gross sales of the alleged combination are in excess of $700,000,000 per year;

that each member of the combination is in competition with other persons and in "pretended competition" with each of the other members of the combination; that the combination "is organized, carried out and managed by stock ownership, common directors and officers, planned common courses of action, conferences, committees, correspondence and exchange of information"; that each member of the combination was "created and acquired by Distillers Corporation-Seagrams, Ltd. . . . and is owned by Distillers Corporation-Seagrams, Ltd. directly and through subsidiary corporations of said combination."

That the members of the combination, including the defendants, "have combined, agreed, conspired and acted together as a combination of capital, skill and acts for the purpose . . . and effect of unfairly competing with other persons engaged" in the same business, and of "restraining, restricting and hindering competition, trade and commerce therein by means of said combination"; that this has been accomplished by placing the following conditions upon the sale to, and resale by, distributors such as plaintiff: (1) allocation of customers; (2) allocation of territories; (3) requirements for minimum purchases and stated percentages of the distributor's aggregate business in the products of members of the combination, and (4) the enforcement of agreements, expressed and implied, "requiring distributors and other purchasers to give notice to members of said combination in advance of dealing in any alcoholic beverage product produced or sold by any person other than a member of said combination."

That on July 1, 1951, "defendants wrongfully demanded that plaintiff surrender its said distributorship with respect to substantial areas of said county in which plaintiff was then defendants' said distributor . . . and permit competitors of plaintiff in said areas to appropriate plaintiff's customers . . . as a condition to the continuation of said distributorship in other areas of said county"; that they demanded that unless plaintiff acceded to their proposal, defendants would repudiate the contract. That thereupon plaintiff did accede to such demand and on January 21, 1952, Calvert required the execution of an instrument in writing designating the areas in which plaintiff would continue as distributor and providing that plaintiff would be sole distributor in those areas for a "period of one year from and after the 1st day

of March, 1952, and subject to renewal from year to year, for like periods, at the option of plaintiff.'' That plaintiff complied with the demand and executed such instrument.

That prior to March 1, 1953, ''plaintiff duly exercised its said option to renew said distributorship'' whereupon Calvert presented to plaintiff for execution a distributorship agreement dated February 5, 1953, which will hereinafter be designated as the 1953 contract; that about June 1, 1953, Calvert allowed others of its distributors to operate in the territory assigned to plaintiff; that the contract contained a provision requiring plaintiff to ''spend no less than 22.1 per cent of its time and effort'' and ''of the money spent by it on advertising and sales promotion'' in the sale and promotion of Calvert products; that this provision was intended by Calvert to prevent plaintiff from distributing the products of other manufacturers and as a means of requiring minimum purchases of Calvert's products; that the contract provided also that plaintiff ''will not undertake the distribution of any additional brands of alcoholic beverages without giving Calvert 90 days' written notice of its intention so to do'' and that ''in the event this contract is not renewed'' plaintiff ''agrees that within 30 days after March 1, 1954, it will return to CALVERT at its invoice price all of the CALVERT merchandise remaining in its inventory''; that the foregoing provisions were intended to prevent plaintiff from dealing in the products of persons other than members of the alleged combination.

That on November 19, 1953, defendants stipulated with the United States Federal Trade Commission in a proceeding pending before that agency entitled ''In the Matter of Distillers Corporation-Seagrams, Ltd. and its subsidiaries'' (1) that defendants (respondents in that proceeding) had required its distributors to give notice in advance of an intention to deal in products of defendants' competitors and (2) that the Commission might make its order declaring such to be ''unfair methods of competition'' and that defendants ''cease and desist'' from such practices; that the order pursuant to the stipulation was entered March 2, 1954.[2]

That on January 28, 1954, plaintiff advised Calvert that it had entered into negotiations with a competitor of Calvert looking toward the distribution of the products of such competitor in addition to those of Calvert; that thereupon Calvert

---

[2]This order, herein referred to as the ''consent decree,'' was refused admission into evidence at the trial. Plaintiff's claim of error in this respect is considered below.

notified plaintiff that it repudiated its 1953 contract and the alleged option to renew it after March 1, 1954; that Calvert gave as its reason for such repudiation plaintiff's intention to distribute the products of a competitor; that thereafter Calvert refused to fill orders placed with it by plaintiff after March 1, 1954; that this repudiation had the effect of restraining competition in alcoholic beverages in violation of state and federal laws; that thereafter ''defendants commenced a systematic course of solicitation of orders for alcoholic beverages of plaintiff's customers''; that in such solicitation defendants used confidential information previously obtained from plaintiff; that plaintiff has been damaged by this course of conduct.

By counts 3 and 5, no new factual allegations are included but the implied prayers thereof will be answered by the discussion below.

The evidence was not sufficient to support finding in favor of plaintiff for either a violation of the contract or by reason of a tort committed by defendants. ■ At the very outset, plaintiff's contention that it had an option to extend the term of its 1953 contract beyond its expiration date, is met by paragraph 11, an express, nonambiguous provision, namely: ''If distributor desires to renew the contract, he shall apply for a renewal not less than 30 days before March 1, 1954.'' By no reasonable construction can it be said that such provision granted plaintiff an option to extend the contract beyond February 28, 1954. Also, if plaintiff had no such option, Calvert was under no inhibition to decline to renew the contract. The quoted clause gave plaintiff only the right to apply to Calvert for such extension; it must do so ''not less than 30 days before March 1, 1954.'' No renewal was assured. The language clearly leaves it to the discretion of Calvert to extend or to decline to extend the contract. ■ The contract having been admitted and being in ordinary words, in common use, the only question left for the trial court's decision was whether that document was a complete expression of all the terms agreed upon. (*Falkenstein* v. *Popper,* 81 Cal.App.2d 131, 137 [183 P.2d 707].) But such was a question of law. (*Heffner* v. *Gross,* 179 Cal. 738, 742 [178 P. 860]; *Miranda* v. *Miranda,* 81 Cal.App.2d 61, 66 [183 P.2d 61].) ■ The court having concluded that the writing had expressed the complete agreement of the parties, it was the function of the court to determine from the docu-

ment itself the meaning thereof. (*O'Connor* v. *West Sacramento Co.*, 189 Cal. 7, 18 [207 P. 527]; *McKenzie* v. *Ray*, 168 Cal. 618, 623 [143 P. 1018].) Hence, the question posed is not what the evidence proved with reference to whether an option for extension of the agreement had been granted but it was whether the trial court properly determined that plaintiff had no right of renewal of the contract.

That no option for plaintiff to renew the contract or to extend its terms is contained in the 1953 contract has been considered and definitely decided by other courts on similar writings. Where a lease for one year provided that the tenant "hereby agrees to give formal notice to the landlord on or before the 15th of January 1920, of tenant's wish as to a continuance of the tenancy beyond the term hereby granted" —the lessee erroneously conceived that he had an option to continue his lease. Judgment for lessee was reversed. There was no ambiguity in the lease. "The only thing accomplished by admitting the oral testimony objected to was to allow the jury to find the making of another agreement which differed from the agreement contained in the written contract of the parties." (*Bernstein* v. *Smith*, 119 Misc. 34 [194 N.Y. Supp. 789, 791].)

Where a lease provided that "six months written notice before the termination of this lease shall be given by either of said parties to the other in the event that either of said parties desires a renewal of said lease, and failure to give said notice shall be regarded as an intention . . . that said lease shall not be renewed," in affirming a judgment for the lessor, the Supreme Court of Massachusetts held: "*The covenant did not create an absolute and unqualified right in either . . . There are no words indicating a right in the lessor to bind the lessee beyond the expiration of the term, or to obligate the lessor in like manner.*" (*Gardella* v. *Greenburg*, 242 Mass. 405 [136 N.E. 106, 26 A.L.R. 1411].

One Sharpe was employed by a written contract at a salary of $450 a month, not to "be reduced during your current Tour of Foreign Duty. However, in the event you fail to work an eight-hour day, six-day week, your pay may be reduced proportionately to the number of lost hours or days in a month . . ." The plaintiff contended that since eight hours constituted a work day, anything over eight hours was overtime for which he should be compensated over and above the $450 salary. In reversing the plaintiff's judgment, the court held that an agreement that if an employee works less than

eight hours a day, six days a week, his pay will be reduced proportionately is not an agreement that if he works more than eight hours a day his monthly salary will be increased proportionately. "Nothing may be added by way of implication except that which is necessary to carry out the intentions of the parties, as derived from the agreement itself and not merely from the circumstances under which it was made . . . And, in the construction of such an agreement it will be conclusively presumed that it expresses their entire understanding." (*Sharpe* v. *Arabian American Oil Co.*, 111 Cal.App.2d 99, 102 [244 P.2d 83].)

For a court to attempt to make a new contract by adding all or any of the conditions laid down as the basis of plaintiff's claims would be to exceed its authority. Matters which were intentionally omitted from a contract may not be added under the guise of interpretation. (*Sharpe* v. *Arabian American Oil Co., supra*; *Foley* v. *Euless*, 214 Cal. 506, 511 [6 P.2d 956]; *Stockton Dry Goods Co.* v. *Girsh*, 36 Cal.2d 677, 681 [227 P.2d 1, 22 A.L.R.2d 1460]; *Ablett* v. *Clauson*, 43 Cal.2d 280, 285 [272 P.2d 753]; *Nissen* v. *Stovall-Wilcoxson Co.*, 120 Cal.App.2d 316, 319 [261 P.2d 249]; *Roberts-Atkinson Co.* v. *International Harvester Co.*, 191 N.C. 291 [131 S.E. 757, 758].)

In *Crossin* v. *Elysian Springs Water Co.*, 105 Cal.App. 449 [287 P. 985], the plaintiff with the defendant's approval in 1922 purchased from one Kinne, a distributor, his truck and the good will of his route. By his contract with Elysian, Crossin had the "exclusive right to sell and distribute . . . water and carbonated beverages" in the described territory for one year, "or such time as the distributor shall faithfully comply with the requirements herein enumerated." After the plaintiff had built up the route from 250 to 600 customers, Elysian terminated the distributorship in 1925 and refused to deliver any more water to him. In his action for damages, Crossin argued that his employment was from year to year and that his agency was coupled with an interest and that his contract could not be cancelled. The court rejected the argument and affirmed the judgment holding that the provision for one year's employment "can only be read as particularly providing that the relationship shall exist for the period of one year, and thereafter during the will of the parties. Unless so read it would be a contract providing for a relationship to exist in perpetuity, something which the law abhors."

Plaintiff's contention that in April 1953 the written con-

tract for 1953 was abrogated by the representatives of the parties is not sustained by the evidence or substantial inferences therefrom; moreover, on January 28, 1954, the president of A.B.C. wrote Calvert requesting a renewal of "our present contract." What really occurred was the mutual, oral elimination of the provision restricting plaintiff's sales to "specified communities."

While plaintiff's president testified that all plaintiff's orders for Calvert products were honored during February 1954, the contention is urged that the appointment of the Snyder Company as a distributor in the fall of 1953 was a breach of the contract. Such claim is met by the language of the contract which "appoints Distributor as *a* distributor." It was, therefore, not a sole distributor and was not entitled exclusively to sell the products of Calvert in the prescribed territory. But it is argued that if the appointment of Snyder was not prohibited by the contract, such inhibition was clearly implied. Such implication is not warranted by the decisions of this state. Where the plaintiff leased to the defendant certain space in its store "to be conducted as a shoe department," the defendant's claim that it thereby gained the exclusive right to operate a shoe department in the store was rejected. The defendant sought "to build an implied covenant upon an inference from the fact that there had always been but one shoe department in the store." Such implication was not warranted. The language of the lease did not indicate "that an exclusive grant was so clearly contemplated that it would be unnecessary to express it." (*Stockton Dry Goods Co.* v. *Girsh, supra,* 36 Cal.2d 677, 680, 681.) A similar holding was announced in *Cousins Inv. Co.* v. *Hastings Clothing Co.,* 45 Cal.App.2d 141, 143 [113 P.2d 878], where it was held that "implied covenants are not favored in the law; and courts will declare the same to exist only when there is a satisfactory basis in the express contract of the parties which makes it necessary to imply certain duties and obligations in order to effect the purpose of the parties to the contract made." (See *Grass* v. *Big Creek Development Co.,* 75 W.Va. 719 [84 S.E. 750, L.R.A. 1915E 1057].)

From such authorities it must be concluded that there was no basis for a holding that an implied agreement that Calvert would not appoint a fourth Calvert distributor was "so clearly within the contemplation of the parties that they deemed it unnecessary to express it." (*Cousins Inv. Co.* v. *Hastings Clothing Co., supra,* p. 149.) Conclusions similar

to those announced in the above cited cases were reached in numerous decisions of other courts. (*Wiley* v. *California Hosiery Co.,* 3 Cal.Unrep. 814 [32 P. 522]; *Dahath Electric Co.* v. *Suburban Electric Dev. Co.,* 332 Pa. 129 [2 A.2d 765]; *J. I. Case Threshing Machine Co.* v. *Wright Hardware Co.,* 61 Tex.Civ.App., 481, 486 [130 S.W. 729]; *Wm. Deering & Co.* v. *Beatty,* 107 Iowa 701 [77 N.W. 325]; *Duboff* v. *Matam Corp.,* 272 App.Div. 502 [71 N.Y.S.2d 134].) Inasmuch as the 1953 contract was a full and complete expression of the parties, the appointment of Snyder as *a* distributor was a lawful act of Calvert and the trial court correctly held that no covenant was violated thereby. (*Heffner* v. *Gross, supra,* 179 Cal. 738, 742; *Miranda* v. *Miranda, supra,* 81 Cal.App.2d 61, 66.) Hence, neither the evidence must be weighed nor the inferences measured. As matters of law, the acts of Calvert are determined to have been correct. ■ Moreover, plaintiff waived such alleged breaches of contract by continued performance on its part without any claim of breach by defendant. (See *International Shoe Co.* v. *Waldron,* 200 Ark. 345 [138 S.W.2d 1046]; 12 Cal.Jur.2d Contracts, § 251, p. 478.)

The testimony that witnesses had visited retailers within the territory after February 28, 1954, and found Calvert salesmen on or near the premises and had observed the products of Calvert which had not been delivered there by plaintiff is wholly beside the question at issue as above decided. If appellant had a perpetual contract to distribute Calvert products in Los Angeles County and if it was entitled to profits earned by the sales of such products, such proof could be considered. But since plaintiff had no contract after February 28, 1954, such evidence is irrelevant.

### Was Refusal to Deal With Plaintiff Lawful?

The Cartwright Anti-Trust Law, Statutes of 1907, chapter 530, was incorporated into the Business and Professions Code, sections 16700 through 16758, in 1941. Section 4[3] of the federal Clayton Act (15 U.S.C.A. § 15) is substantially

---

[3]Clayton Act, section 4, 15 U.S.C.A. § 15.
"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

like section 16750,[4] Business and Professions Code, which authorizes a person injured in his business or property by reason of anything forbidden to recover twofold the damages sustained. But the right to double damages is not exclusive. The local statute "merely articulates in greater detail a public policy against restraint of trade that has long been recognized at common law. Thus, under the common law of this state combinations entered into for the purpose of restraining competition and fixing prices are unlawful . . . One whose business has been injured by the activities of a combination in restraint of trade is entitled to damages, not only under the Cartwright Act (Bus. & Prof. Code, § 16750), but also under the common law. (Civ. Code, § 3281, see cases cited in 36 Am.Jur. 660, n. 9.)" (*Speegle* v. *Board of Fire Underwriters*, 29 Cal.2d 34 at 44 and 46 [172 P.2d 867].) We must therefore inquire whether the proof presents substantial evidence of an unreasonable restraint of trade on the part of defendants.

Calvert's alleged reason for not renewing its contract because plaintiff was taking on the line of Schenley, one of Calvert's principal competitors, is not sufficient to make it guilty of antitrust law violation. Where a defendant had refused to renew a contract with the plaintiff, the plaintiff charged a violation of section 1 of the Sherman Act and section 3 of the Clayton Act. It contended that the defendant had declined to renew their contract because plaintiff had refused to give up the handling of a competing product. A judgment for plaintiff was reversed, because "plaintiff had no tenure, no right to a renewal of his contract as master dealer. Defendant on the other hand had an absolute right either to renew or not to renew it, and the exercise by it of that right did not, it could not form the basis of a suit under section 15." (*Hudson Sales Corp.* v. *Waldrip*, 211 F.2d 268. See *Nelson Radio & Supply Co.* v. *Motorola*, 200 F.2d 911.)

Plaintiff's position is not unlike that of one Brosious who sued Pepsi-Cola Company and its distributor for treble damages under the antitrust act after he had purchased such

---

[4]Business and Professions Code, section 16750.

"Any person who is injured in his business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor in any court having jurisdiction in the county where the defendant resides or is found, or any agent resides or is found, or where service may be obtained, without respect to the amount in controversy, and to recover twofold the damages sustained by him, and the costs of suit."

product from Cloverdale for six years. When Cloverdale conditioned its sale of Pepsi-Cola to Brosious upon the latter's agreement to sell only Pepsi-Cola, and after the Pepsi-Cola Company refused to approve Cloverdale's conduct, Brosious charged a conspiracy between the producer and its distributor. But the court found no evidence that would support the finding of a conspiracy to violate the antitrust laws. "It is the right, long recognized of a trader engaged in a strictly private business, freely to exercise his own independent discretion as to the parties with whom he will deal." (*Brosious* v. *Pepsi-Cola Co.*, 155 F.2d 99, 102.)

Other federal courts have announced the same doctrine with clarity and finality.

"In general, it seems a necessary part of our business mores for a manufacturer to have free selection in dealing with its distributors. Upon the recognition of this fact, why may he not refuse to do business with one who deals in a closely competitive product?" (*Camfield Mfg. Co.* v. *McGraw Electric Co.* (Del., 1947), 70 F.Supp. 477.)

"Every manufacturer has a natural and complete monopoly of his particular product, especially when sold under his own private brand or trade name." (*Schwing Motor Co.* v. *Hudson Sales Corp.* (Md., 1956), 138 F.Supp. 899, 902.)

"We have not yet reached the stage where the selection of a trader's customers is made for him by the government." (*Great Atlantic & Pacific Tea Co.* v. *Cream of Wheat Co.* (C.C.A.2, 1915), 227 F. 46, 49.)

"Likewise a wholesale dealer has the right to stop dealing with a manufacturer 'for the reasons sufficient to himself.' " (*Federal Trade Com.* v. *Raymond Bros.-Clark Co.* (1924), 263 U.S. 565 [44 S.Ct. 162, 68 L.Ed. 448, 30 A.L.R. 1114].)

"It requires no argument to demonstrate that appellant [plaintiff] had the right to decline to sell any but its own product upon the leased property." (*Associated Oil Co.* v. *Myers* (1933), 217 Cal. 297, 306 [18 P.2d 668].)

From the foregoing authorities and the pronouncements of the several courts, it is clear that unless Calvert had agreed with another party not to deal with plaintiff there was no restraint of trade in Calvert's refusing to use plaintiff as its distributor. The fact that plaintiff had contracted with one of Calvert's competitors to distribute the latter's products also, was not sufficient to render the refusal to pro-

ceed with plaintiff a monopoly. (*Rolley, Inc.* v. *Merle Norman Cosmetics,* 129 Cal.App.2d 844, 851 [278 P.2d 63, 282 P.2d 991].) From the mere fact of Calvert's refusal to sell plaintiffs, no inference of unlawful agreement can arise for the reason that a producer "may lawfully select his own customers." (*Johnson* v. *J. H. Yost Lbr. Co.,* 117 F.2d 53, 61; *Theatre Enterprises* v. *Paramount Distrib. Corp.,* 346 U.S. 537, 541 [74 S.Ct. 257, 98 L.Ed. 273]; *Speegle* v. *Board of Fire Underwriters, supra,* 29 Cal.2d 34, 38. See *Webster Motor Car Co.* v. *Packard Motor Car Co.,* 135 F.Supp. 4, 8; *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons,* 340 U.S. 211, 213 [71 S.Ct. 259, 95 L.Ed. 219].) Conspiracy was proved in the Kiefer-Stewart case by showing the conferences between the officials of Seagram and Calvert, "concerning sales of liquor to" Kiefer-Stewart and sales were made to other wholesalers who abided by the conditions but no shipments were made to Kiefer-Stewart. It was proved that the agreement *worked an injury to the public.*

The statistics that from 1951 to 1954, inclusive, Calvert distributed not to exceed 7 per cent of the nation's consumed distilled spirits and not over 3 per cent of those consumed in California disprove that it was a monopoly. Judge Hand held that "it is doubtful whether sixty or sixty-four per cent would be enough and certainly thirty three per cent is not." (*United States* v. *Aluminum Co. of America,* 148 F.2d 416, 424.)

Further to show that Calvert did not act violative of either the federal or state fair trade act, it fixed no prices upon its product except those which it sold to plaintiff and the prices at which the latter sold to retailers. In its 1953 contract with plaintiff, it specified the retail prices to be charged by plaintiff to retailers should be in accordance with the Fair Trade Act of California. Such control by Calvert over resale prices to be charged by plaintiff is in accordance with the law. (Cal. Alcoholic Beverage Control Act, Bus. & Prof. Code, §§ 24750, 24756.) The cited act prevails in the event it should conflict with other statutes. (*Nelson* v. *Reilly,* 88 Cal.App.2d 303, 306 [198 P.2d 694].)

With meticulous severity plaintiff arrays three paragraphs (2, 9 and 12)[5] of the 1953 contract and seeks to have them

---

[5] "2. Distributor hereby accepts the appointment as such distributor and agrees to sell and distribute to retail licensees such alcoholic beverages within the designated territory. Distributor warrants that during

declared illegal. The purpose of this action is to determine whether plaintiff by defendants' refusal to extend the term of the 1953 contract suffered detriment and whether the refusal to renew the contract caused damage to the plaintiff. Plaintiff has striven valiantly to establish the affirmative of both questions. Now, whether paragraph 2 was designed to prevent plaintiff from purchasing and selling the products of other manufacturers, competitors of Calvert, or whether paragraph 9 was used to prevent plaintiff from purchasing and selling the products of other manufacturers in competition with Calvert, or whether paragraph 12 was a punitive and unlawful covenant running with the goods is immaterial. Plaintiff approved those paragraphs along with the others when it signed the contract in 1953 and subsequently when it demanded a renewal of such contract. There is no showing that plaintiff suffered injury by reason of such paragraphs from March 1952 to March 1954.

Moreover, the law is against plaintiff's contention. In the absence of injury to the plaintiff, a violation of the antitrust statute is not actionable by a private party. (*Wolfe* v. *National Lead Co.*, 225 F.2d 427, 432; *Karseal Corp.* v. *Richfield Oil Corp.*, 221 F.2d 358, 362; *Sargent* v. *National Broadcasting Co.*, 136 F.Supp. 560, 566.)

Plaintiff contends that Calvert misused information it gained from plaintiff during the tenure of their contract. The record discloses no instance in which Calvert used any information gained from plaintiff except when it used information relative to its own business and the information was used with plaintiff's consent. (See *Alex Foods, Inc.* v. *Metcalfe*, 137 Cal.App.2d 415, 427 [290 P.2d 646].) The solicitation of business from those concerns made known to

the year ending December 31st, 1952, the proportion of its total sales of alcoholic beverages represented by CALVERT products was 22.1 per cent. Distributor agrees that during the term of this contract, it will spend no less than 22.1 per cent of its time and effort on the sale of CALVERT products and not less than 22.1 per cent of the money spent by it on advertising and sales promotion shall be expended on Calvert products.''

''9. Distributor represents that at the time of the execution of this agreement, it is acting as a distributor of the brands of alcoholic beverages listed on Exhibit B attached hereto.

''Distributor agrees that it will not undertake the distribution of any additional brands of alcoholic beverages without giving CALVERT 90 days' written notice of its intention so to do.''

''12. In the event this contract is not renewed, Distributor agrees that within 30 days after March 1, 1954, it will return to Calvert at its invoice price all of the Calvert merchandise remaining in its inventory.''

Calvert through information furnished by plaintiff after the distributorship had been terminated "is not unlawful and does not constitute . . . trade secrets." (*J. C. Millett Co.* v. *Park Tilford Distillers Corp.*, 123 F.Supp. 484, 496.)

Plaintiff was not injured in any way by Calvert's use of information gained from plaintiff.

Plaintiff asserts an exclusive perennial right to deal with customers to whom it had sold Calvert's products during the period of the contract. No such right is upheld by law. When plaintiff's 1953 contract terminated, Calvert was at liberty to advise any other distributor with reference to retailers within his area. ■ There is "no vested and indefeasible right to monopolize customers." (*Corica* v. *Ragen*, 140 F.2d 496, 498.) Customers are not things to be owned by anyone. They are the life-stream of trade and commerce; are free to choose for themselves and to be chosen by those whose only motive is to advance their own welfare and to do no harm to others. So long as his competition is fairly and legally conducted and he is not restrained by negative covenants, a former employee is free to solicit business from his former employer's customers. (*Aetna Building Maintenance Co.* v. *West*, 39 Cal.2d 198, 203 [246 P.2d 11]; *Avocado Sales Co* v. *Wyse*, 122 Cal. 627, 634 [10 P.2d 485].)

■ Plaintiff contends that Calvert violated the alcoholic Beverage Control Act (Bus. & Prof. Code, § 23366) by selling its products directly to retailers. Not only is such claim negatived by the declarations of the complaint but there is no evidence that Calvert sold its products to retailers, and if Calvert's employees had made an illegal sale to a retailer, such illegality would not justify an action against Calvert unless it was the proximate cause of injury to plaintiff. It will be readily conceded that a sale by Calvert made after plaintiff's relations with Calvert had terminated could not have proximately caused injury to plaintiff.

Inasmuch as we have concluded that Calvert in refusing to sell to plaintiff had not acted in violation of any antitrust statute, it follows that Chivas also had a right to refuse to distribute its products through plaintiff. There is no evidence of an unlawful conspiracy, as plaintiff contends, between Chivas and Calvert. Both corporations were justified in distributing their products through the same distributors. There is no evidence that they conspired unlawfully to re-

strain trade. There was no error in granting the nonsuit as to Chivas.

Judgment affirmed.

Fox, J., and Ashburn, J., concurred.

A petition for a rehearing was denied October 28, 1957, and appellant's petition for a hearing by the Supreme Court was denied November 26, 1957. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.